### K.E.W.

v.

### The STATE of Texas.

Nos. 01–08–00371–CV, 01–08–00372–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 31, 2008.

Rehearing Overruled Feb. 2, 2009.

Richard H. Branson, League City, TX, for Appellant.

Donald S. Glywasky, Galveston County Legal Department, Robert V. Shattuck, Jr., Roger L. Ezell, Criminal District Attorney, Galveston, TX, for Appellee.

Panel consists of Justices TAFT, KEYES, and ALCALA.

## OPINION

TIM TAFT, Justice.

█ In these two accelerated appeals, appellant, K.E.W., challenges the legal and factual sufficiency[1] of an order of involuntary commitment for temporary inpatient mental health services[2] and a related order for the administration of psychoactive medications.[3] We determine whether the evidence was legally sufficient to support the challenged orders.[4] We reverse and render judgment in favor of K.E.W.

## Background

On April 17, 2008, K.E.W., a patient of Gulf Coast Center Mental Health and Mental Retardation ("MHMR") who had previously been diagnosed as schizophrenic, went in for an appointment that he had made. Although a regular patient, he had not been seen by the staff since the prior October. While at the Gulf Coast Center, K.E.W. informed the staff that he had a plan to impregnate multiple women and asked repeatedly for a particular female staff member whom he stated that he wanted to impregnate.[5] The staff became concerned with his extremely paranoid behavior and his attempts to interfere with female staff even though he was directed otherwise. The staff ultimately placed the female staff member behind a closed door until K.E.W. could be escorted away by the police. K.E.W. would not stand still or listen to others and was walking in and around the building, pacing and smoking, refusing to stop or calm down. Dr. Pugh, the physician who saw him for the appointment, believed that K.E.W. did not have an appropriate insight into his situation and might be a danger to others and called

1. Although appellant has listed a separate issue complaining that there is "no evidence" to support the trial court's orders, we observe that a "no evidence" argument is a legal insufficiency argument. See Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 620 (Tex.2004) (discussing "no evidence" and "insufficient" evidence standards of review and noting that "no evidence is sometimes referred to as being legally insufficient, the issue being one of law, while evidence so against the preponderance of other evidence that the judgment it supports is clearly wrong is sometimes referred to as being factually insufficient"). We therefore consider appellant's "no evidence" complaint in our resolution of his legal sufficiency challenge.

2. Trial court cause number 3318; appellate court cause number 01–08–00371–CV.

3. Trial court cause number 3318A; appellate court cause number 01–08–00372–CV.

4. Although the specified terms of both orders was a period of 90 days, which has expired, the doctrine of mootness does not apply to appeals from involuntary commitments for temporary hospitalization, State v. Lodge, 608 S.W.2d 910, 912 (Tex.1980), or an order to administer psychoactive medication. J.M. v. State, 178 S.W.3d 185, 189–90 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

5. The physician's certificate of medical examination of April 17, 2008, signed by Dr. Waleska Ortiz, indicates that K.E.W. had been "searching for his daughter." Pugh's notions in K.E.W.'s medical records regarding the visit to the Gulf Coast Center on April 17th indicate that K.E.W had been vehement about contacting his step-daughter. This information suggests that the female staff member that K.E.W. was attempting to contact at the Gulf Coast Center was his step-daughter.

the police.[6] When the police arrived, K.E.W. was uncooperative, and he was placed in the back of the police car and escorted to the hospital at the University of Texas Medical Branch at Galveston.

At the hospital, K.E.W. explained to doctors that aliens put a computer chip in his abdomen and right ring finger and that he was chosen to help populate a new and better race of humans. His goal was to search and find as many women as he could to procreate quickly, and he had a firm belief that there was a flock or group of women whom he needed to find and impregnate, one of whom was his adult step-daughter. He believed that some of the women for whom he was searching had been at or near the hospital when he was brought into the emergency room and that the hospital staff had known that and discussed it but had withheld information from him about it, and he was very angry at the staff for not giving him the information he needed. He became very agitated and insisted that he needed to leave in order to complete his mission and asked the treatment team to help him contact the women. He was diagnosed as having schizoaffective disorder, specifically being paranoid schizo-chronic.

The State filed an application for court-ordered temporary mental health services and an application for an order to administer psychoactive medication. At the hearing on the State's application for temporary commitment, in addition to limited testimony from two members of the Gulf Coast Center's staff about the events which led to K.E.W.'s hospitalization, and appellant's medical records,[7] there was testimony from Dr. Michael Stone and Dr. Waleska Ortiz. Both were physicians who met with K.E.W. at the hospital after he was taken there from the Gulf Coast Center MHMR.

Stone[8] stated that he did a psychiatric evaluation of K.E.W. and determined that K.E.W. was suffering from mental illness and had been diagnosed as schizophrenic. Stone testified that K.E.W. demonstrated that he was a danger to others, citing K.E.W.'s statements to him on several occasions that there was a flock or group of women, including his step-daughter, whom K.E.W. needed to find and impregnate.[9] Stone also believed that K.E.W. could be a danger to others because, during the meeting with Pugh, K.E.W. "was very threatening to the point [that] Dr. Pugh felt [K.E.W.] needed to be admitted [to the hospital] immediately."[10] Stone admitted that K.E.W. did not manifest any threatening behavior to him while K.E.W. was in the hospital, but stated that he was very concerned because K.E.W. had a very firm belief in his delusions, and Stone thought that if K.E.W. found a female whom he believed was promised to him, he would

---

6. This information was relayed to the trial court via medical records; Dr. Pugh did not testify in court.

7. It is unclear from the record what documentary exhibits were actually admitted. At the beginning of the hearing, there was a stipulation to "the medical records ... except to the extent they contain hearsay," and the records were admitted subject to that stipulation, but no marked exhibit was identified with that stipulation. Later in the hearing, State's Exhibit 1 is mentioned, as is "the patient's chart that has been removed from the unit," which was described as State's Exhibit 2 and which was stipulated to by the parties and was admitted. However, State's Exhibit 2 was withdrawn and does not appear in the record.

8. The parties stipulated to Stone's qualifications as an expert.

9. According to Stone, K.E.W. also told him that he needed to marry his step-daughter.

10. Stone did not further describe how K.E.W. had been "very threatening."

try to impregnate her. Stone agreed that K.E.W. had difficulty processing information and considered K.E.W. to have abnormal physical, mental, and psychiatric deterioration because of the bizarre nature and frequency of his delusions. He also did not believe K.E.W. was capable of functioning independently in the community because K.E.W. did not believe he had a mental illness, was set on finding his flock of women and impregnating them, and was preoccupied with his delusions. Stone recommended antipsychotic medication and treatment at Austin State Hospital.

Stone admitted that he had not verified the existence of any of the women whom K.E.W. claimed that he wished to impregnate and, as far as he knew, K.E.W. had taken no concrete steps to find them, though K.E.W. had a plan to carry out the creation of a new society and carried papers about the plan with him. He admitted also that K.E.W. said that he was not planning on impregnating the women against their will, but was concerned whether K.E.W. would understand what a woman would consider to be against her will. He agreed that the only group that K.E.W. was a danger to was these women, and women in general in society, because K.E.W., in his confused belief, might believe mistakenly that a woman was one who was promised to him and wanted to be impregnated.

Dr. Ortiz testified that, while in the hospital, K.E.W. became agitated regarding the women he was seeking. She detailed an incident where K.E.W. believed that some of the women he was seeking had been in the emergency room and that he had just missed them. K.E.W. believed that the hospital staff, including Ortiz, knew this and had information where the women were, but were withholding it from him. He thought that he heard Ortiz and the nurses laughing about how he had just missed the women, thought it was a conspiracy against him, and was very upset. He was convinced that Ortiz was able to access special agents who would have the key that would take him to the portal where the women were located. He also told Ortiz that he had the ability to hear thoughts through special frequencies and told her that he may have heard or perceived that she was probably lying to him.

Ortiz was concerned about two behaviors of K.E.W. as a potential danger. The first was the potential for non-consensual sexual interaction with the specific women he sought, if he were to find them. She explained that K.E.W. was very intrusive, had invaded her space on several occasions, and she did not know if he would understand that "no" meant "no," given his state of mind at the time. However, she admitted that K.E.W. did not state that he intended to impregnate anyone against her will and did not make sexual advances toward anyone on the staff. The second concern was related to K.E.W's misperception that he received information from brain waves or special abilities. Ortiz feared that K.E.W. could get very angry and agitated if he perceived or misperceived certain information. Ortiz felt that the unit was organized and safe but, if K.E.W. was in another situation, with another stimulus, "perhaps something would happen."

K.E.W. put on no testimony or evidence.

The trial court found that K.E.W. was suffering from mental illness and, as a result of that mental illness, was likely to cause serious harm to others. The court also found that K.E.W. was suffering from severe and abnormal mental, emotional, and physical distress, and ordered him committed to the Austin State Hospital for inpatient care not to exceed 90 days. In its written order, the trial court stated that it found, by clear and convincing evi-

dence, that K.E.W. was mentally ill, and that, as a result of that mental illness, K.E.W. was "likely to cause harm to others," was "suffering severe and abnormal mental, emotional, or physical distress," was "experiencing substantial mental or physical deterioration of his ability to function independently, which [was] exhibited by [K.E.W.'s] inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety," and was "unable to make a rational and informed decision as to whether or not to submit to treatment."

The court then held a hearing on the administration of psychoactive medication. The State called Dr. Stone, who testified that K.E.W. was taking some medications ordered for him and refusing others, and that, in Stone's opinion, K.E.W. was not capable of understanding the need for medication because of his mental illness. Stone explained that K.E.W. did not really believe that he needed medication, and only agreed to take one medication, which Stone was not sure was working. Stone stated that there was no other alternative treatment and that antipsychotics, anxiolytics, sedatives, hypnotic mood stabilizers, and antidepressants would be in K.E.W.'s best interest.

K.E.W. then testified that he thought that doctors were trying to keep him away from the real medicine he needed—his "displaced family and friends that [he] had come from far away to see and a large group of those individuals that they're referring to." That was the "real medication that [would] heal [his] heart, mind, body and soul." He stated that it was wrong for someone to tell him that his belief system was not correct and that he was tired of coming to court "over a period of time from dimension to dimension," having his feelings put on trial, being sent to a hospital, and being forced to take medications to try to make him forget his feelings. He spoke of medicines that he had taken before that he felt helped him, and stated that the antipsychotics did not change his point of view, which was what "this is about" and which was "not right." He explained that he had had these feelings for decades having gone through "multidimensional realities after being over it." He told the court that he did not have schizophrenia, but did have major depression and posttraumatic stress disorder, and wanted to take two particular medicines. He insisted that he did not have delusions.

The trial court granted the order to administer psychoactive medication.[11]

## Order for Temporary Commitment

### A. Burden of Proof

■ Before a trial court may render an order for temporary, involuntary commitment, it must find, from clear and convincing evidence, that

(1) the proposed patient is mentally ill; and

(2) as a result of that mental illness, the proposed patient

    (A) is likely to cause serious harm to himself;

    (B) is likely to cause serious harm to others; or

    (C) is:

11. After the court did so, K.E.W. told the judge that there was a factual basis to the incident that Ortiz had mentioned about the people that he was supposed to meet having been in the emergency room, stated that he would like to make contact with them, and said that he heard, and had evidence, that some of them might be "in a very precarious situation" and that the court "would like their situation helped."

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) is unable to make a rational and informed decision as to whether or not to submit to treatment.

TEX. HEALTH & SAFETY CODE ANN. § 574.034(a) (Vernon 2003). The trial court must specify which criteria listed in subsection (a)(2) form the basis for its decision per Texas Health and Safety Code section 574.034(c), and appellate review is limited to the criteria specified by the court. *See Johnstone v. State,* 961 S.W.2d 385, 388 (Tex.App.-Houston [1st Dist.] 1997, no pet.).

■ In order to be clear and convincing for the purposes of subsection (a), the evidence must include expert testimony and, unless waived, there must be evidence of either "a recent overt act" or "a continuing pattern of behavior" that tends to confirm:

(1) the likelihood of serious harm to the proposed patient or others; or

(2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.

TEX. HEALTH & SAFETY CODE ANN. § 574.034(d) (Vernon 2003). The "recent overt act or continuing pattern of behavior proven by the State must relate to the criterion on which the judgment is based." *J.M. v. State,* 178 S.W.3d 185, 193 (Tex. App.-Houston [1st Dist.] 2005, no pet.).

■ While expert testimony is required by the statute, an expert's diagnosis alone is not sufficient to confine a patient for compulsory treatment.[12] *State ex. rel. C.C., III,* 253 S.W.3d 888, 893 (Tex.App.-Dallas 2008, no pet. hist.); *State ex. rel.*

---

**12.** The requirement of subsection (d) of section 574.034 that there be evidence of a confirming recent overt act or continuing pattern of behavior does not conflict with the provision in subsection (f) in that same section that provides that a court may make its findings solely from medical certificates if the proposed patient and his attorney file waivers of the right to cross-examine witnesses. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 574.034(d), (f) (Vernon 2003). Subsection (d) deals with the *substance* of the evidence that must be provided to the court in order to make the evidence clear and convincing, while subsection (f) deals with a particular *manner* in which such evidence may be presented to the court. The State is required, regardless of the manner in which it presents its evidence, to present the evidence required under subsection (d) in order to make the evidence supporting commitment clear and convincing. *See In re Breeden,* 4 S.W.3d 782, 788 (Tex.App.-San Antonio 1999, no pet.) (reversing order of commitment when State presented testimony from three doctors who all expressed opinion that appellant would continue to suffer distress and deterioration of ability to function independently, but record lacked sufficient evidence of recent act or continuing pattern of behavior to confirm these assertions); *see also State ex. rel. Mayberry,* 685 S.W.2d 121, 124–25 (Tex.App.-Amarillo 1985, no writ) (holding, under prior version of statute, that medical certificates were insufficient to sustain order of commitment where certificates failed to provide sufficiently detailed factual basis for physicians' conclusions); *accord State ex. rel. C.R.W.,* No. 06–08–00028–CV, 2008 WL 1839031 at *3, *7, *8 (Tex.App.-Texarkana April 25, 2008, no pet.) (memo op.) (noting that "doctors' certificates alone *could* constitute sufficient evidence" to support trial court's findings, but holding that they did not when certificates did not provide evidence of recent overt act or continuing pattern of behavior that confirmed that appellant was likely to harm herself) (emphasis in original).

*E.E.*, 224 S.W.3d 791, 794 (Tex.App.-Texarkana 2007, no pet.); *State ex. rel. C.O.*, 65 S.W.3d 175, 181 (Tex.App.-Tyler 2001, no pet.). "A bald diagnosis alone is insufficient to support commitment." *In re Breeden*, 4 S.W.3d 782, 784 (Tex.App.-San Antonio 1999, no pet.). An expert opinion recommending involuntary commitment must be supported by a showing of the factual bases on which it is grounded. *C.C., III*, 253 S.W.3d at 893; *In re F.M.*, 183 S.W.3d 489, 499 (Tex.App.-Houston [14th Dist.] 2005, no pet.); *J.M.*, 178 S.W.3d at 193; *State ex. rel. K.D.C.*, 78 S.W.3d 543, 547 (Tex.App.-Amarillo 2002, no pet.); *K.T. v. State*, 68 S.W.3d 887, 893 (Tex.App.-Houston [1st Dist.] 2002, no pet.). "The State cannot meet its burden of proof without presenting evidence of the behavior of the proposed patient that provides the factual basis for the expert opinion." *E.E.*, 224 S.W.3d at 794; *C.O.*, 65 S.W.3d at 181. Even though an expert's opinion may be valid, the legislature has mandated that more than conclusory opinions by experts are required before a person may be involuntarily committed for inpatient mental health services. *See J.M.*, 178 S.W.3d at 195; *In re C.E.*, 100 S.W.3d 368, 371–72 (Tex.App.-San Antonio 2002, no pet.); *K.D.C.*, 78 S.W.3d at 547. Evidence of a recent overt act or continuing pattern of behavior that tends to confirm either the likelihood of serious harm to the proposed patient or others or the proposed patient's distress and the deteri-

oration of the proposed patient's ability to function is "specifically required by the Texas Health and Safety Code in addition to expert opinion"[13] before an order of commitment may be rendered.[14] *F.M.*, 183 S.W.3d at 494; *see also C.E.*, 100 S.W.3d at 369, 371; TEX. HEALTH & SAFETY CODE ANN. § 574.034(d). Evidence that merely reflects that a person is mentally ill, and in need of hospitalization, does not satisfy the statutory standard for involuntary commitment and will not be sufficient to meet the State's burden. *C.C., III*, 253 S.W.3d at 893; *F.M.*, 183 S.W.3d at 494; *J.M.*, 178 S.W.3d at 193; *G.H. v. State*, 96 S.W.3d 629, 634 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *K.D.C.*, 78 S.W.3d at 547; *K.T.*, 68 S.W.3d at 892; *C.O.*, 65 S.W.3d at 181; *State ex. rel. P.W.*, 801 S.W.2d 1, 3 (Tex.App.-Fort Worth 1990, writ denied); *Johnstone*, 961 S.W.2d at 388–90; *Broussard v. State*, 827 S.W.2d 619, 622 (Tex.App.-Corpus Christi 1992, no writ).

■■■■ Nor is the State's burden met by testimony of "possible" or "potential" harm to the proposed patient or others. *See J.M.*, 178 S.W.3d at 196; *State ex. rel. L.C.F.*, 96 S.W.3d 651, 657 (Tex.App.-El Paso 2003, no pet.); *C.O.*, 65 S.W.3d at 181–82; *Broussard*, 827 S.W.2d at 622. Rather, when the State alleges that a proposed patient may harm himself or others, it must provide proof, by clear and convincing evidence, that the proposed patient is *likely* to do so. *See C.O.*, 65 S.W.3d at

---

13. This "further showing" may be provided by expert testimony or by other evidence. *In re F.M.*, 183 S.W.3d 489, 499 (Tex. App.-Houston [14th Dist.] 2005, no pet.).

14. *See also Breeden*, 4 S.W.3d at 788 (noting that "what is lacking from the record . . . is sufficient evidence of a *recent act or continuing pattern of behavior* that tends to confirm [the expert's] assertions.") (emphasis in original); *Broussard v. State*, 827 S.W.2d 619, 622 (Tex.App.-Corpus Christi 1992, no writ) (hold-

ing evidence insufficient to support confinement where record lacked "any evidence of an overt act or continuing pattern of behavior"); *see also State ex. rel. P.W.*, 801 S.W.2d 1, 3 (Tex.App.-Fort Worth 1990, writ denied) (holding evidence insufficient when record contained expert testimony, but "no real evidence" that proposed patient ever tried to hurt herself or others, or that her condition was deteriorating to point where she might do so).

181–82; *P.W.*, 801 S.W.2d at 3. There must be a substantial threat of harm, based on actual dangerous behavior, manifested by some overt act or threats in the past. *See J.M.*, 178 S.W.3d at 193; *K.D.C.*, 78 S.W.3d at 547; *Taylor v. State*, 671 S.W.2d 535, 538 (Tex.App.-Houston [1st Dist.] 1983, no writ).

## B. Legal Sufficiency to Support the Temporary Commitment Order

■ In reviewing a "no evidence," or legal insufficiency, claim in the case of a temporary involuntary commitment, because of the heightened clear-and-convincing burden of proof in the trial court, we apply an elevated appellate standard of review. *J.M.*, 178 S.W.3d at 190–92. We must "look at all of the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex.2002). In doing so, we must give appropriate deference to the fact finder's conclusions, and we must "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* Therefore, we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible," though we do not disregard undisputed facts that do not support the finding. *Id.* In support of its order for temporary involuntary commitment, the trial court stated that it found, by clear and convincing evidence, that K.E.W. was mentally ill, and made positive findings under subsections (a)(2)(B) and (C)(i), (ii), (iii).

K.E.W. asserts that there is no evidence, or insufficient evidence, to support either the finding that he is mentally ill or the findings under subsections (a)(2)(B) and (C)(i), (ii), (iii). He specifically argues that the two testifying doctors disagreed on his diagnosis of mental illness [15] and that evidence of bizarre beliefs and irrational thoughts was not necessarily evidence of mental illness. He also asserts that there was no evidence of an overt act or continuing pattern of behavior that tends to confirm the likelihood of serious harm to others or his distress and the deterioration of his ability to function. He contends that neither doctor testified that he had made any sexual advances toward women at the hospital and that Dr. Stone testified that there was no evidence that K.E.W. would do anything to women against their will. He argues that the behavior testified to by Drs. Stone and Ortiz was merely evidence of mental illness, not of an overt act or a continuing pattern of behavior demonstrating his distress and deterioration of his ability to function.

The State responds that the evidence is uncontroverted that K.E.W. is suffering from schizophrenia, is living "in a delusional state under the belief he has been abducted by aliens who have tasked him with creating new superior races by impregnating a select group of females," which included "one of the women working at the very Gulf Coast Center he was treated at," and that "when he came looking for her he was prevented by physical intervention of the staff of law enforcement." The State further argues that the evidence established that the "acute distress of K.E.W.'s condition was that he had deteriorated to the point he was unable to comprehend the reality of his illness or treatment; his ability to care for himself was evidenced by his disheveled dress and the socks he had

---

15. Dr. Stone testified that K.E.W. was schizophrenic while Dr. Ortiz testified that he suffered from schizoaffective disorder.

been wearing for weeks." The State contends that "the deterioration of KEW's conduct to the point he was apparently looking for one of the women, identified to him by the aliens for the creation of a superior race, at the MHMR Center and his diminished ability to clothe himself properly," was sufficient to support the order of commitment.

We consider first the trial court's finding under section 574.034(a)(1) that K.E.W. was mentally ill. Reviewing the evidence in the light most favorable to the trial court's findings, we hold that a reasonable trier of fact could have formed a firm belief that its finding that K.E.W. was mentally ill was true. We therefore hold that the evidence was legally sufficient to support that finding.

We next consider the legal sufficiency of the evidence under section 574.034(a)(2) to demonstrate either that K.E.W was likely to cause serious harm to others,[16] or that he was suffering severe and abnormal mental, emotional, or physical distress and experiencing substantial deterioration of his ability to function independently. To demonstrate the latter, the evidence must exhibit K.E.W's inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety and was unable to make a rational and informed decision as to whether or not to submit to treatment.[17]

Review of the record indicates that very little evidence was presented on the issue of an overt act or continuing pattern of behavior confirming K.E.W.'s distress and the deterioration of his ability to function. The State cites as evidentiary support the fact that K.E.W. was disheveled and was wearing the same socks for weeks as proof of a diminished ability to clothe himself properly. But these facts were not cited as support by either Dr. Stone or Dr. Ortiz,[18] neither of which spoke to the question of K.E.W's ability to function independently or to provide for his basic needs. "[P]oor grooming is insufficient 'to justify depriving an individual of her liberty,'" and poor hygiene, while demonstrative of mental illness, does not, in itself "rise to the level of an overt act or pattern of behavior that confirms a substantial deterioration of a person's ability to function independently to provide for her basic needs." *See Armstrong v. State,* 190 S.W.3d 246, 252 (Tex.App.-Houston [1st Dist.] 2006, no pet.), citing to *J.M.,* 178 S.W.3d at 195 (holding that patient's refusal to bathe and brush her teeth did not rise to level of sufficient act or pattern of behavior to support court ordered mental health services). Section 574.034(a)(2)(C)(ii) requires a showing of the deterioration of a proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety. The only questions posited to either doctor in reference to the requirements of section 574.034(a)(2)(C)(ii) was one to Stone by the State, asking if he thought, given K.E.W.'s delusions, K.E.W. was capable of function-

---

16. Tex. Health and Safety Code Ann. § 574.034(a)(2)(A) (Vernon 2003).

17. Tex. Health and Safety Code Ann. § 574.034(a)(2)(C) (Vernon 2003).

18. These facts appear in Ortiz's progress notes of April 18, 2008, as part of her mental status exam where she notes that K.E.W. was

"[d]ressed appropriately but unshaven and initially he had been wearing the same socks over a period of a couple of weeks," and Dr. Gonzalez's progress notes of April 20, 21, and 22, 2008, which noted K.E.W.'s appearance as "disheveled." However, Dr. Pastusek's notes on the date of K.E.W's admission to the hospital simply describe K.E.W.'s appearance as "casually attired."

ing independently in the community, to which Stone answered that he did not, and then one to Stone by K.E.W., asking why the doctor felt K.E.W. was not capable of functioning independently, to which the doctor replied that K.E.W. did not believe or understand that he had a mental illness and was focused on his delusions about the women. Neither response provides any facts that exhibit K.E.W.'s inability to provide for his basic needs.

On the record before us, there was no evidence of an overt act or continuing pattern of behavior that confirmed K.E.W.'s deterioration of his ability to function independently as exhibited by his inability to provide for his basic needs. Accordingly, we hold that, on the evidence in this record, a reasonable trier of fact could not have formed a firm belief or conviction that such finding was true, and we hold that the evidence was legally insufficient to support the trial court's finding under section 574.034(a)(2)(C).

Lastly, we turn to the trial court's finding under section 574.034(a)(2)(B), that K.E.W. was likely to cause serious harm to others. K.E.W. argues that there is no evidence, or insufficient evidence, of a recent overt act or continuing pattern of behavior to support the likelihood of him causing serious harm to others, noting that he denied having any intent to impregnate women against their will, and citing a lack of evidence that he had made any sexual advances toward women at the hospital. The State responds that he went looking for one of the women he was interested in impregnating and was prevented from contacting her only through physical intervention.

█ We first note that the evidence of K.E.W.'s ongoing psychotic behavior itself does not support the statutory requirement of a recent overt act or continuing pattern of behavior that tends to confirm that K.E.W. is likely to seriously harm others. "Texas courts universally hold that the State must show more than delusions, angry or psychotic behavior, or other facts that merely confirm mental illness" in order to "establish the requisite [recent] overt act or continuing pattern of behavior" required by section 574.034(d). *C.O.*, 65 S.W.3d at 182 (holding that evidence of "continuing delusional behavior, hostile behavior, and provocative statements to others" merely reflected that an individual was mentally ill and in need of hospitalization, but did not provide the continuing pattern of behavior necessary to support involuntary commitment); *see also C.C., III*, 253 S.W.3d at 893; *F.M.*, 183 S.W.3d at 494; *J.M.*, 178 S.W.3d at 193; *G.H.*, 96 S.W.3d at 634; *K.D.C.*, 78 S.W.3d at 548–51; *K.T.*, 68 S.W.3d at 892; *Johnstone*, 961 S.W.2d at 388–90; *Broussard*, 827 S.W.2d at 622; *P.W.*, 801 S.W.2d at 3.

█ Nor does the testimony from Dr. Ortiz and Dr. Stone provide sufficient factual bases to meet the statutory requirement.

In discussing his opinion that K.E.W. could be a danger to others, Stone expressed a concern that K.E.W. would act on his delusions, try to impregnate a woman if he found one whom he thought was promised to him, and would not appreciate whether a particular women wished to be impregnated. To support his opinion, Stone cited the beliefs expressed by K.E.W. and his adherence to them, and the fact that Dr. Pugh thought K.E.W. so threatening that he should be immediately admitted to the hospital. Stone admitted that K.E.W. said that he was not planning on impregnating anyone against her will, and as far as Stone knew, K.E.W. took no concrete steps to find the women.

Ortiz expressed concern about the "potential dangerousness" of K.E.W.'s behavior. Ortiz stated that she "[did not] know," if K.E.W. were to find the women he was seeking, "whether the sexual interaction would be consensual or not," but admitted that K.E.W. did not say that he intended to impregnate anyone against her will and did not make any sexual advances toward anyone on the staff. Ortiz also said that she "[did not] know" if K.E.W. would understand that "no" meant "no," because he was "very intrusive" and had "invaded [her] space" on several occasions when he was stressing his need to leave the facility. Ortiz was also concerned with K.E.W.'s belief that he received information from brain waves and special abilities and said that she "[did not] know" whether, if K.E.W. perceived or misperceived certain information, K.E.W. might "get very angry or agitated." The doctor testified that K.E.W. became agitated at the unit when he believed that he had just missed the women and thought that the doctor and nurses had conspired against him. Ortiz did not indicate that K.E.W. harmed, or threatened to harm, anyone during the incident. Ortiz expressed concern that if K.E.W. were outside of a hospital environment, "perhaps something would happen" and she "wasn't convinced that it would not."

Neither doctor was present at the Gulf Coast Medical Center at the time K.E.W. was taken into custody and neither pointed to any specific actions taken by K.E.W. at the center as a basis for rendering an opinion.[19] Stone cited the incident at the center as a behavior by K.E.W. that made him believe that K.E.W. could be a harm to others, but merely described that K.E.W. had an MHMR appointment, had met with Pugh, and had been so threatening that Pugh felt that K.E.W. needed to be immediately admitted to the hospital. Stone did not testify about the specific actions that K.E.W. had taken which caused Pugh to feel that K.E.W. was a threat, nor did Stone testify that any such specific actions caused Stone to believe that K.E.W. was likely to cause serious harm to others. Ortiz did not refer to the specific incident at all while stating her opinion.

■ While K.E.W's beliefs and mental illness certainly give rise to the potential of harm to others, in order to support commitment, the threat of harm must be substantial and based on actual dangerous

---

19. Stone was later recalled to the stand, was asked if he had had an opportunity to review the patient's record, and was requested to read from the record. Stone stated that there were no notes or writings that indicated that K.E.W. was groping any women, but K.E.W. told Dr. Pugh of a plan to impregnate multiple women. When asked if Pugh had written why he thought it necessary to put K.E.W. in the hospital, Stone read aloud, "He is also very vehement about contacting his stepdaughter who per Rebecca Sealy Hospital notes he has a history of verbally raping. He is clearly delusional ... and refusing medications. He has very little insight and continues to attempt to interfere with female staff although he has been directed otherwise. Because of his behavior, I feel that he may be a danger to others."

Ortiz was also given medical records to review and asked if she recalled the specific behaviors by K.E.W. that had been the impetus for his admission to the hospital. She stated that K.E.W. had had an MHMR appointment with Pugh, had exhibited behavior that Pugh considered paranoid, and that there "was a certain tension and agitation in addition to the bizarre dilution [sic] delusions." When asked if K.E.W. was touching or groping women, Ortiz responded, "I don't know," and when asked if she had "seen that in the chart," Ortiz stated that the chart said, "Patient wants the female," but she could not make out any more of the handwriting on the nurse's chart.

Pugh did not testify at the commitment hearing.

behavior manifested by some overt act or threats in the past. *See J.M.,* 178 S.W.3d at 193; *K.D.C.,* 78 S.W.3d at 547; *Taylor,* 671 S.W.2d at 538. "Potential" harm is not sufficient to deprive a person of his liberty. *See J.M.,* 178 S.W.3d at 196; *L.C.F.,* 96 S.W.3d at 657 (holding that "an opinion of a 'potential danger' to others is not sufficient to support a commitment under this standard"); *C.O.,* 65 S.W.3d at 181–82 (holding that "[b]are psychiatric expert opinion of a potential danger to others is insufficient to support a commitment" and there must be facts in record to justify conclusion that appellant was likely to cause serious harm); *see also Broussard,* 827 S.W.2d at 622 (holding that bare psychiatric expert opinion of "potential danger" to others insufficient to support commitment). Thus K.E.W.'s beliefs, and his adherence to them, and his psychotic behavior, while indicative of mental illness, are not sufficient in themselves, to constitute an "overt act" or "continuing pattern of behavior" that would support a finding that he was likely to cause serious harm to others.

▇ Remaining as a possible overt act confirming the likelihood that K.E.W. would cause serious harm to others—and the one most relied on by the State—is K.E.W's conduct at the Gulf Coast Center MHMR. Review of the record indicates significant gaps in the evidence related to this incident. The record suggests that K.E.W. made a statement of a sexual nature to the woman at the center but the record does not contain the statement and the question itself was struck from the record. Likewise, the record does not contain a complete description of the actual sequence of events at the center and, in particular, does not contain a description of the specific actions taken by K.E.W. that caused the staff to take the actions that they did. Although one witness was asked why it was necessary to protect the female staff member from K.E.W., the response was struck from the record. There is, accordingly, no evidence in the record on appeal of the particular actions on the part of K.E.W. that caused the staff to feel that K.E.W. was a threat. What remains in the record is that K.E.W. went to Gulf Coast Center MHMR; was agitated and pacing; was vehemently insistent on contacting a female worker whom he identified, at some unspecified point, as one of the women he believed he should impregnate as part of his mission to create a superior race; was uncooperative and attempted to interfere with female staff even though directed otherwise; exhibited paranoid behavior; and the staff was fearful enough to seclude the object of his interest and felt that appellant was a sufficient threat to call the police to escort him away.

The record before us establishes that appellant was mentally ill and suffered from serious delusions that might potentially result in serious harm to others if carried out. It establishes that K.E.W. attempted to contact one of the women regarding whom he had a delusion and that the women's co-workers felt that K.E.W. was a threat. But the record does not establish *specific* overt acts or a continuing pattern of behavior by appellant that would tend to *confirm* that appellant was *likely* to sexually assault the female staff member or cause any kind of serious harm to others.

The evidentiary standards for involuntary commitment are high, *E.E.,* 224 S.W.3d at 794, because involuntary commitment is a drastic measure. *C.O.,* 65 S.W.3d at 182. To justify depriving an individual of his liberty, more than "potential" harm is necessary. *C.O.,* 65 S.W.3d at 182. That a person may be a potential danger is insufficient to support commitment under the statute. *J.M.,* 178 S.W.3d

at 196; *L.C.F.*, 96 S.W.3d at 657; *C.O.*, 65 S.W.3d at 181–82; *Broussard*, 827 S.W.2d at 622; *Taylor*, 671 S.W.2d at 538. The evidence in the record before us does not rise to the level of clear and convincing evidence that K.E.W. was likely to cause serious harm to others.[20] We hold that, on the record before us, a factfinder could not have reasonably formed a firm belief that its finding that K.E.W. was likely to cause serious harm to others was true. *Cf. J.M.*, 178 S.W.3d at 193–94 (discussing how no specific details were provided about threats of suicide, such as when threats were made, to whom, under what circumstances, or their severity). We therefore hold that the evidence was legally insufficient to support the trial court's finding under section 574.034(a)(2)(B) and sustain K.E.W.'s first issue to the extent that it challenges the legal sufficiency of the temporary commitment order. Having so found, we need not consider K.E.W.'s challenge to the factual sufficiency of the evidence supporting the order. *See M.S. v. State*, 137 S.W.3d 131, 137 (Tex.App.-Houston [1st Dist.] 2004, no pet.).

### Order to Administer Psychoactive Medication

■■■ K.E.W. also contends that if the commitment order is reversed, the order to administer psychoactive medication cannot stand because an order authorizing the administration of psychoactive medication may be entered only if the patient is under a valid order for temporary or extended services. See TEX. HEALTH & SAFETY CODE ANN. § 574.106(a)(1) (Vernon Supp.2008). This is correct; without a valid order for temporary or extended mental health services, the order authorizing the administration of psychoactive medications is not authorized by statute. *Id.*; *C.C., III*, 253 S.W.3d at 895; *Breeden*, 4 S.W.3d at 790. Because we reverse the trial court's order of temporary commitment, we also reverse the order to administer psychoactive medications to K.E.W. and sustain K.E.W.'s first issue to the extent that it challenges the medication order. We therefore do not consider K.E.W.'s factual sufficiency challenge to this order. *M.S.*, 137 S.W.3d at 137.

### Conclusion

We reverse the judgment of the trial court ordering temporary impatient mental health services and the order to administer psychoactive medications and render judgment denying the State's applications to commit K.E.W. for court-ordered temporary mental health services and to administer psychoactive medications to K.E.W.

Justice KEYES, dissenting.

---

**20.** This case may well be "another one of those cases where the necessary elements for commitment seem 'to lurk just beyond the proof presented.' " *See In re. B.M.*, No. 04–99–00433–CV, 2000 WL 35874, at *3 (Tex. App.-San Antonio, January 19, 2000, no pet.) (not designated for publication) (citation omitted). In this case, perhaps there were such facts, possibly in the testimony that was struck from the record or in the testimony that might have been elicited from Pugh, had he been called to testify, but these circumstances are not in the record before us. We concur in the sentiments of our sister court expressed in *In re J.J.K.*, that "we are reluctant to deny court-ordered treatment for any- one who is ill. However, within [the record] before us, we do not find the State proved its case by clear and convincing evidence as it is required to do." Nos. 14–03–00379–CV, 14–03–00380–CV, 2003 WL 22996950, at *5 (Tex. App.-Houston [14th Dist.] 2003, no pet.) (not designated for publication) (holding that evidence that appellant suffered severe delusions, became so agitated at the hospital that she had to be physically restrained, knocked door off hinges in hospital, and engaged in verbal altercations with others was insufficient to support commitment; determining that there was no evidence of overt acts that would tend to confirm that appellant would cause serious harm to self or others).

**CORRECTED DISSENTING OPINION**

EVELYN V. KEYES, Justice.

I respectfully dissent. In these two accelerated appeals, the majority reverses the judgment of the trial court ordering temporary inpatient mental health services and the trial court's order to administer psychoactive medications to appellant, K.E.W., a paranoid schizophrenic. I believe the State fully satisfied the statutory criteria for proving from clear and convincing evidence that at the time of his involuntary commitment, appellant was mentally ill and, as a result, was likely to cause serious harm to others, was suffering severe and abnormal mental and emotional distress, and was unable to make a rational informed decision as to whether or not to submit to treatment, and, therefore, should be involuntarily committed to inpatient psychiatric services.[1] My dissent is broader than this one case, however.

The majority opinion carries forward a recently developed line of cases in this Court that, in my view, misconstrues the "clear and convincing" standard of proof of involuntary psychiatric commitment, set out in section 574.034 of the Texas Health and Safety Code, in contravention of the purpose and plain language of the statute, raising the standard so high that a commitment order cannot survive a legal or factual sufficiency challenge in this Court. The result is the routine overturning of the involuntary commitments of mentally ill patients who present immediate threats to their own health and welfare and the safety of the community and the generation of a direct conflict with our sister court, the Fourteenth Court of Appeals, demonstrating the arbitrary and capricious application of the statute. I would affirm both the judgment of the trial court ordering temporary inpatient mental health services

and the order to administer psychoactive medications to appellant, rather than reversing both.

**Analysis**

Section 574.034 of the Texas Health and Safety Code, governing orders for temporary mental health services, provides as follows for involuntary commitment to inpatient mental health services:

(a) The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:

(1) the proposed patient is mentally ill; and

(2) as a result of that mental illness, the proposed patient:

(A) is likely to cause serious harm to himself;

(B) is likely to cause serious harm to others; or

(C) is:

(i) suffering severe and abnormal mental, emotional, or physical distress;

(ii) experiencing substantial deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and

(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.

. . . .

(c) If the judge or jury finds that the proposed patient meets the commit-

---

1. *See* Tex. Health & Safety Code Ann. § 574.034 (Vernon 2003).

ment criteria prescribed by Subsection (a), the judge or jury must specify which criterion listed in Subsection (a)(2) forms the basis for the decision.

(d) *To be clear and convincing under subsection (a), the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:*

  (1) *the likelihood of serious harm to the proposed patient or others; or*

  (2) *the proposed patient's distress and the deterioration of the proposed patient's ability to function.*

. . . .

(f) The proposed patient and the proposed patient's attorney, by a written document filed with the court, may waive the right to cross-examine witnesses, and, if that right is waived, the court may admit, as evidence, the certificates of medical examination for mental illness. The certificates admitted under this subsection constitute competent medical or psychiatric testimony, and the court may make its findings solely from the certificates. If the proposed patient and the proposed patient's attorney do not waive in writing the right to cross-examine witnesses, the court shall proceed to hear testimony. The testimony must include competent medical or psychiatric testimony. In addition, the court may consider the testimony of a non-physician mental health professional as provided by Section 574.031(f).

. . . .

Tex. Health & Safety Code Ann. § 574.034 (Vernon 2003) (emphasis added).

In construing the "clear and convincing" standard of review set out in subsection 574.034(d), the majority opinion states:

> [A]n expert opinion recommending involuntary commitment must be supported by the showing of the factual bases on which it is grounded and not simply recite the statutory criteria. *Id.*; *K.T. v. State*, 68 S.W.3d 887, 893 (Tex.App.-Houston [1st Dist.] 2002, no pet.). *Thus the expert should describe the specific behaviors of the proposed patient on which the expert's opinion is based.* See *In re K.D.C.*, 78 S.W.3d 543, 550 (Tex. App.-Amarillo 2002, no pet.). It is also well established that *evidence that merely reflects that a person is mentally ill and in need of hospitalization is no evidence that the statutory standard for involuntary commitment has been met and will not suffice to support the statutory requirement for an overt act or continuing pattern of behavior.* See *J.M.*, 178 S.W.3d at 194–96; *G.H. v. State*, 96 S.W.3d 629, 634 (Tex.App.-Houston [1st Dist.] 2002, no pet.); *K.T.*, 68 S.W.3d at 892; *Johnstone*, 961 S.W.2d at 388–90.

*K.E.W. v. State*, Nos. 01–08–00371–CV & 01–08–00372–CV, 276 S.W.3d 686, 694 (Tex.App.-Houston [1st Dist.] Dec. 31, 2008, no pet. h.) (emphasis added); *see also M.S. v. State*, 137 S.W.3d 131, 135 (Tex.App.-Houston [1st Dist.] 2004, no pet.).

I acknowledge that cases upon which the majority relies do count expert testimony that "merely reflects that a person is mentally ill and in need of hospitalization" as "no evidence" or insufficient evidence to justify involuntary commitment. The majority's error, however, is to misconstrue expert and fact witness testimony that "describe[s] the specific behaviors of the proposed patient," his "recent overt act[s]," and "a continuing pattern of behavior that

tends to confirm: either (1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function" as "merely" evidence that "a person is mentally ill and in need of hospitalization" and, therefore, as *no evidence* satisfying the standard of proof for involuntary commitment. On this interpretation of the evidentiary requirement, *nothing* can satisfy the "clear and convincing evidence" standard of proof required for involuntary commitment under section 574.034(d).

By its plain language, subsection 574.034(d) requires "clear and convincing ... expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: [either] (1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to function." TEX. HEALTH & SAFETY CODE ANN. § 574.034(d). It thus plainly seeks to assure that a person is not deprived of his liberty and committed to involuntary medical care *unless* he has been evaluated by a medical expert and has not merely been shown by a description of his overt acts or pattern of behavior to satisfy a clinical standard of a mentally ill person but has demonstrated that his confinement and treatment are necessary for his own safety or that of others or for his well-being because of his demonstrated dangerousness or distress and inability to function. It is absurd to read the statute as stating that the expert testimony of a proposed patient's treating physician of recent overt acts (including statements and agitated behavior) demonstrating the proposed patient's danger to others and a pattern of behavior that tends to confirm the patient's distress and inability to function are *no evidence* under the statute *because* they come from experts who have

recently observed and treated the proposed patient and who are trained to recognize the indicia of dangerousness and dysfunction caused by mental illness.

What the majority has actually done, by reading the statute and prior case law in this way, is to substitute its own unsupported lay conclusions as to the dangerousness of K.E.W. and his ability to function for the inferences that can reasonably be drawn from the record. That is, the majority simply disregards as irrelevant or "insufficient" the testimony of the personnel who witnessed appellant's search for his step-daughter at the MHMR and the opinions of K.E.W.'s doctors based on treatment sessions with K.E.W., and, relying on nothing at all but its interpretation of the requirements of past case law, the majority concludes that at the time of the commitment hearing K.E.W. was not shown to be dangerous to others or distressed and unable to function. Not a scintilla of evidence from the record supports the majority's conclusion that K.E.W. was not shown to be dangerous or distressed and unable to function. Indeed, the record contradicts the majority's conclusion.

Michael Fields, an employee of the Gulf Coast Center MHMR where appellant was searching for his stepdaughter, testified at the commitment hearing that he was present when K.E.W. came into the Center on the day of the incident. When asked to "describe what behaviors you saw him engage in," he testified:

> [Mr. Fields]: He was—he appeared to be extremely paranoid. He was difficult to redirect. I noticed a lot of pacing on his part. He was also asking numerous times for a certain female staff that worked there, and we ended up having to place her in the back behind a closed door until we

were able to have [K.E.W.] escorted off by the mental health deputies....

....

[The State]: As a result of those behaviors you had to call the police?

[Mr. Fields]: Yes, the police were called out and at one point they had to place him in the back of the vehicle because, again, he was uncooperative. And I am assuming that was probably for his safety as well as others.

The following testimony by Dr. Michael Stone, one of K.E.W.'s treating psychiatrists, is likewise illustrative of the evidence the majority finds to be *"no evidence"* of *"a recent overt act or a continuing pattern of behavior"* tending to show either "the likelihood of serious harm" by appellant to himself or others or appellant's "distress and the deterioration of [his] ability to function." *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(d). Dr. Stone testified that he psychiatrically evaluated K.E.W. when he was involuntarily committed and that K.E.W. suffered from schizophrenia. When asked on cross-examination whether he could give an example of "either his behaviors or what he said directly to you" that led him to the opinion K.E.W. was a danger to others, Dr. Stone testified:

[Dr. Stone]: Yes. He has said to me on several occasions in talking to him that he believes that there are a flock or group of women, including his stepdaughter, who he is—who he needs to find and impregnate. He needs to find these women and impregnate them. He said he needs to marry his step-daughter and impregnate her, as well.

....

[The State]: Any other behaviors that alerted you or makes you believe that he could be a harm to others?

[Dr. Stone]: One of the reasons he was brought here in the MHMR appointment on the day he was admitted here he was meeting with Doctor Pugh and Doctor Pugh, he was very threatening to the point Doctor Pugh felt he needed to be admitted here immediately.

....

[The State]: Because of his delusions is the delusion such he could harm others?

[Dr. Stone]: Yes. He has a very firm belie[f] that there are these women he needs to track down and impregnate. That he feels very strongly about this. This is either a mission he needs to be on or in some ways compelled to do this. But there are women he needs to track down and impregnate them. I am concerned in his delusional state, because he is very delusional, that he will act on this. He has been out of the State hospital for a relatively brief period of time and my concern is with these delusions active still that he is very likely to act on them. I am very concerned if he were to find a female that he believed was promised him that he would then try to impregnate her.

Dr. Stone also testified to K.E.W.'s inability to function independently:

[K.E.W.]: You said he was not capable of functioning independently and you didn't give details why it was you said that.

[Dr. Stone]: It's because I believe that he, first of all, does not believe he has a mental illness does not understand he has a mental illness; that he is very set on continuing to work on what he feels are the needs to find these people and have his flock of women and impregnate them. He is very concerned with his delusions. I

don't think he can function outside a hospital setting at this time.

Dr. Stone also testified to his belief that women in general in the society would be at risk if K.E.W. were not treated. He testified,

> In fact on the unit we're very careful when female medical staff go to talk to him to keep the door open. Not because he is homicidal, but in his confused belief he could believe a woman is there and someone promised to him that does want to be impregnated.

In addition, Dr. Waleska Ortiz, another of K.E.W.'s treating psychiatrists, testified that he had seen K.E.W. daily during the week preceding the hearing. When asked to testify what he had seen in general, he replied:

> [Dr. Ortiz]: With him in general there was the particular concern regarding the women, and I wanted to know more about his particular beliefs regarding that. And what I noticed is that he would become very agitated regarding the belief of the women. For instance, when he was in the emergency room he experienced—I say "experienced" because it's unclear if he heard it or just information that was provided to him, but he experienced the knowledge that some of the women that he was seeking were actually in the emergency room and that he had just missed them and that certain staff members in the emergency room had that information about where their whereabouts were and they were withholding that information from him and that it was some sort of conspiracy to keep those women. So he was very upset because he had just missed them.

> [The State]: How did he act when he was upset?

> [Dr. Ortiz]: I wasn't present in the emergency room but according to the clinical record he became very agitated.

. . . .

> [The State]: His behavior was of agitation?

> [Dr. Ortiz]: Yes.

> [The State]: Did you see the same type of agitation on the unit when you met with him personally?

> [Dr. Ortiz]: Not to the degree that was described in the medical record, and I say that because of the emergency room setting he required PRN medications at that time. In the times where I personally interacted with him he became agitated in that his body status was very tense. He was very intrusive. He invaded my space on several occasions because it was very important to him to stress that he needed to leave from here. And there were also additional times where he had an experience where he heard or experienced that I knew where the women were located. And when I continually denied that, I knew then he was convinced that I was able to access these special agents that would have the key that would take him to the portal where some of the women were particularly located at.

> [The State]: How did he convey that to you?

> [Dr. Ortiz]: He told me.

. . . .

> [The State]: You wrote a narrative, you have memorialized as of April 21 some findings and some recommendations. Do you recall writing a narrative?

> [Dr. Ortiz]: Yes.

> [The State]: In that narrative you indicated on the second page, "The potential dangerousness of this behavior is

concerning to the treatment team." What behavior did you think was a potential danger?

[Dr. Ortiz]: The two behaviors were, one, the women themselves. They are actually on his person because some of the papers I have on the chart were from papers he himself wanted me to share with the Court. And so I made copies of that for the record which has several of the names of the women he is searching for. One of them is his step-daughter. He has a picture of her in her person and he showed them. I saw pictures of the step-daughter when she was age four or five and I have also seen her as an adult.

Those are one of the women that he was searching for. I don't know—my concern with those specific women, I don't know if the sexual interaction that would occur if he were to find them would be consensual or not. And because he has very intrusive I don't know he would understand no means no, given his state of mind at the time.

The other concern that I had was related to his misperception regardless how he got that information, whether he heard it from brain waves or—because he has these special abilities, from what he tells me. I don't know if he perceives or misperceives certain information he can get very angry and agitated.

The unit is a very organized and safe setting so a lot of things that could have happened in the external world haven't happened because of that order. My concern is if he is in another situation given another stimulus, perhaps something would happen, and I wasn't convinced it wouldn't. That's what was concerning.

I cannot disregard either such eyewitness testimony or such expert testimony by appellant's attending psychiatrists as *no evidence*, or legally insufficient evidence, of either the likelihood of appellant's causing serious harm to others *or* appellant's "distress and the deterioration of [his] ability to function." I think it is clear and convincing evidence of both, and I do not think section 574.034(d) permits a court to disregard such evidence. I believe the quoted testimony by Drs. Stone and Ortiz, appellant's treating psychiatrists, even without the other evidence set out in the majority opinion, is sufficient to establish a firm conviction that appellant at the time of his involuntary commitment both committed overt acts and showed a *continuing pattern of behavior that tended to confirm* both his likelihood of causing serious harm to others and his distress and the deterioration of his ability to function. *See* TEX. HEALTH & SAFETY CODE ANN. § 574.034(d).

In addition, I would point out that section 574.034(f) provides that, if the proposed patient and his attorney file a waiver of the right to cross-examine witnesses, certificates of medical examination for mental illness "constitute competent medical or psychiatric testimony, and the court may make its findings *solely* from the certificates." TEX. HEALTH & SAFETY CODE ANN. § 574.034(f) (emphasis added). Alternatively, if, as here, the proposed patient does not waive the right to cross-examine witnesses, "[t]he testimony *must* include competent medical or psychiatric testimony" and, additionally, "the court *may* consider the testimony of a nonphysician mental health professional." *Id.* (emphasis added).

I find it impossible to reconcile the mandate of section 574.034(f) that expert medical testimony is both necessary and sufficient to sustain an order of involuntary

commitment when there is no live testimony, and necessary when there is, with the majority's construction of section 574.034(d) and its conclusion that expert testimony from treating physicians regarding the proposed patient's mental illness is simply irrelevant or legally insufficient to prove his tendency to harm himself or others or his inability to function due to mental illness.

In addition, I note that in *G.H. v. State*, a case upon which the majority relies in this case, this Court acknowledged a split in the courts of appeals on the interpretation of the "clear and convincing" standard of proof in section 574.034. *G.H. v. State*, 96 S.W.3d 629, 635 (Tex.App.-Houston [1st Dist.] 2002, no pet.). The panel in that case refused to follow our sister court *even with respect to the same patient*, stating:

> In reaching our holding, we note the recent decision from our sister court affirming a prior temporary commitment order concerning appellant. *See In re G.H.*, 94 S.W.3d 115 (Tex.App.-Houston [14th Dist.] 2002, no pet.). In its majority opinion, the court of appeals concluded, based on testimony concerning appellant's delusional behavior and her refusal to take prescribed medications, that the evidence was legally and factually sufficient to support the trial court's decision to temporarily commit appellant. *Id.* at 116–17. Because the majority opinion in that case does not follow the reasoning of *K.T.* or of the cases cited therein, which hold that mere evidence of a patient's mental illness and refusal to take medication is not sufficient to sustain the State's statutory burden, we disagree with the analysis applied by the majority opinion of that court. *See K.T.*, 68 S.W.3d at 892.

*Id.*

I have been unable to find a single recent case from this Court affirming an involuntary commitment order. Thus, I infer that the standard of review established by this Court for involuntary commitment of a mental patient is not only contrary to the plain language of the statute, out of harmony with its other provisions and purpose, and in conflict with our sister court's construction of the same standard, but so high that no commitment order can survive a legal or factual sufficiency of the evidence challenge made in this Court. If so, the Court's criterion for "clear and convincing" evidence of behavior satisfying the requirements of the statute vitiates the statute. I also note that the fact that a sister court has reached an opposite conclusion with respect to the *same* patient under the *same* statute indicates that commitment under the statute has become arbitrary—a matter of which appellate court receives the case and what evidence of mental illness it will recognize as tending to confirm that a prospective patient presents a likelihood of harm to himself or others or exhibits distress and the deterioration of his ability to function.

I would hold that, under a plain language reading of section 574.034, evidence of appellant's overt acts leading to his hospitalization, testified to by two members of the staff of the Center, and of his ongoing pattern of threatening and distressed and dysfunctional psychotic behavior, on which the expert opinions of Drs. Stone and Ortiz were based, plainly satisfies the "clear and convincing" standard of review of evidence tending to establish the likelihood of serious harm being caused by the proposed patient or the proposed patient's distress and the deterioration of his ability to function. *See K.T.*, 68 S.W.3d at 890 ("The clear and convincing standard is the degree of proof that will produce in the mind of the trier of fact 'a firm belief or conviction' as to the truth of the allegations sought to be proved.").

### Conclusion

I would *affirm the judgment of the trial court ordering temporary inpatient mental health services and the order to administer psychoactive medications.*