Opinion issued December 30, 2010



In The

Court
of Appeals

For The

First
District of Texas

————————————

NOS. 01-08-00371-CV

          01-08-00372-CV

———————————

K.E.W., Appellant

V.

The State of Texas, Appellee



 



 

On Appeal
from the Probate Court

Galveston
County, Texas



Trial Court Case Nos. 3318 & 3318A

 



 

 

O P I N I O N

          In
these accelerated appeals, the trial court signed orders to commit appellant
K.E.W. for temporary mental health services[1]
and for the administration of psychoactive medication.[2]  See Texas
Mental Health Code, Tex. Health &
Safety Code Ann. §§ 574.034,
.070, .106(a)(1) (Vernon 2010).  A
divided panel of this Court held there was legally insufficient evidence to
support the two orders, reversed the trial court’s orders, and rendered judgments
in K.E.W.’s favor.  K.E.W. v. State, 276 S.W.3d 686, 700 (Tex. App.—Houston [1st Dist.]
2008), rev’d, 315 S.W.3d 16 (Tex.
2010).  The Supreme Court of Texas held
the evidence was legally sufficient, reversed our judgments, and remanded the
cases to this Court to consider K.E.W.’s factual‑sufficiency
complaints.  315 S.W.3d at 27.  We affirm.

Background

          On April 17, 2008, K.E.W., a patient of Gulf
Coast Center Mental Health and Mental Retardation (“MHMR”) who had previously
been diagnosed as schizophrenic, went in for an appointment that he had made.  Although a regular patient, he had not been
seen by the staff since the prior October.  While at the Gulf Coast Center, K.E.W.
informed the staff that he had a plan to impregnate multiple women and asked
repeatedly for a particular female staff member, his adult stepdaughter, whom
he stated that he wanted to impregnate.  The
staff became concerned with his extremely paranoid behavior and his attempts to
interfere with female staff even though he was directed otherwise.  The staff ultimately placed the female staff
member behind a closed door until K.E.W. could be escorted away by the police.
K.E.W. would not stand still or listen to others and was walking in and around
the building, pacing and smoking, refusing to stop or calm down.  Dr. Pugh, the physician who saw him for the
appointment, believed that K.E.W. did not have an appropriate insight into his
situation and might be a danger to others and called the police.  When the police arrived, K.E.W. was
uncooperative, and he was placed in the back of the police car and escorted to
the hospital at The University of Texas Medical Branch at Galveston.

          At the hospital, K.E.W. explained to doctors that aliens had
put a computer chip in his abdomen and right ring finger and that he was chosen
to help populate a new and better race of humans.  His goal was to search and find as many women
as he could to procreate quickly, and he had a firm belief that there was a
flock or group of women whom he needed to find and impregnate, one of whom was
his adult stepdaughter.  He believed that
some of the women for whom he was searching had been at or near the hospital
when he was brought into the emergency room and that the hospital staff had
known that and discussed it but had withheld information from him about it, and
he was very angry at the staff for not giving him the information he needed.  He became very agitated and insisted that he
needed to leave in order to complete his mission and asked the treatment team
to help him contact the women.  He was
diagnosed as having schizoaffective disorder, specifically being paranoid
schizo-chronic.

          The State applied for court‑ordered temporary mental
health services and for an order to administer psychoactive medication.  At the hearing on the State’s application for
temporary commitment, in addition to limited testimony from two members of the
Gulf Coast Center’s staff about the events that led to K.E.W.’s hospitalization
and testimony about appellant’s medical records, there was testimony from Dr.
Michael Stone and Dr. Waleska Ortiz.  Both
were physicians who met with K.E.W. at the hospital after he was taken there
from the Gulf Coast Center.

          Dr. Stone stated that he did a psychiatric evaluation of
K.E.W. and determined that K.E.W. was suffering from mental illness and had
been diagnosed as schizophrenic.  He testified
that K.E.W. demonstrated that he was a danger to others, citing K.E.W.’s
statements to him on several occasions that there was a flock or group of
women, including his stepdaughter, whom K.E.W. needed to find and impregnate.  Dr. Stone also believed that K.E.W. could be
a danger to others because, during the meeting with Dr. Pugh, the doctor with
whom K.E.W. had the appointment at MHMR, K.E.W. “was very threatening to the
point [that] Dr. Pugh felt [K.E.W.] needed to be admitted [to the hospital] immediately.”  Dr. Stone admitted that he had not verified
the existence of any of the women whom K.E.W. claimed he wished to impregnate
and, as far as he knew, K.E.W. had taken no concrete steps to find them, although
K.E.W. had a plan to carry out the creation of a new society and carried papers
about the plan with him.  Dr. Stone also admitted
that K.E.W. said that he was not planning on impregnating the women against
their will, but he was concerned as to whether K.E.W. would understand what a
woman would consider to be against her will.  He agreed that the only group K.E.W. was a
danger to was these women and women in society in general because K.E.W., in
his confused belief, might mistakenly believe that a woman was one who was
promised to him and wanted to be impregnated.

          Dr. Ortiz testified that, while in the hospital, K.E.W.
became agitated regarding the women he was seeking.  She detailed an incident where K.E.W. believed
that some of the women he was seeking had been in the emergency room and that
he had just missed them.  K.E.W. believed
that the hospital staff, including Dr. Ortiz, knew this and had information regarding
where the women were, but were withholding it from him.  He thought that he heard Dr. Ortiz and the
nurses laughing about how he had just missed the women, thought it was a
conspiracy against him, and was very upset.  He was convinced that Dr. Ortiz was able to
access special agents who would have the key that would take him to the portal
where the women were located.  He also
told Dr. Ortiz that he had the ability to hear thoughts through special
frequencies and told her that he may have heard or perceived that she was
probably lying to him.

          Dr. Ortiz was concerned about two behaviors of K.E.W. as
potentially dangerous.  The first was the
potential for nonconsensual sexual interaction with the specific women he
sought, if he were to find them.  She testified
that K.E.W. was very intrusive, that he invaded her space on several occasions,
and that she did not know if he would understand that “no” meant “no,” given
his state of mind at the time.  However,
she admitted that K.E.W. did not state that he intended to impregnate anyone
against her will and did not make sexual advances towards anyone on the staff.  Dr. Ortiz’s second concern was related to
K.E.W’s misperception that he received information from brain waves or special
abilities.  Dr. Ortiz feared that K.E.W.
could get very angry and agitated if he perceived or misperceived certain
information.  She thought that the hospital
unit was organized and safe but, if K.E.W. was in another situation, with
another stimulus, “perhaps something would happen.”

          K.E.W. put on no testimony or evidence.

          The trial court found that K.E.W. was suffering from mental
illness and, as a result of that mental illness, was likely to cause serious
harm to others.  The court also found
that K.E.W. was suffering from severe and abnormal mental, emotional, and
physical distress, and ordered him committed to the Austin State Hospital for
inpatient care not to exceed 90 days.  In
its written order, the trial court stated that it found, by clear and
convincing evidence, that K.E.W. was mentally ill, and that, as a result of
that mental illness, K.E.W. was “likely to cause harm to others,” was
“suffering severe and abnormal mental, emotional, or physical distress,” was “experiencing
substantial mental or physical deterioration of his ability to function
independently, which [was] exhibited by [K.E.W.’s] inability, except for
reasons of indigence, to provide for his basic needs, including food, clothing,
health, or safety,” and was “unable to make a rational and informed decision as
to whether or not to submit to treatment.”

          The court then held a hearing on the administration of
psychoactive medication.  The State
called Dr. Stone, who testified that K.E.W. was taking some medications ordered
for him and refusing others, and that, in Dr. Stone’s opinion, K.E.W. was not
capable of understanding the need for medication because of his mental illness.
 Dr. Stone testified that K.E.W. did not
really believe that he needed medication and that he only agreed to take one
medication, which Dr. Stone was not sure was working.  Dr. Stone stated that there was no other
alternative treatment and that antipsychotics, anxiolytics, sedatives, hypnotic
mood stabilizers, and antidepressants would be in K.E.W.’s best interest.

          K.E.W. then testified that he thought that doctors were
trying to keep him away from the real medicine he needed—his “displaced family
and friends that [he] had come from far away to see and a large group of those
individuals that they’re referring to.”  That
was the “real medication that [would] heal [his] heart, mind, body and soul.”  He stated that it was wrong for someone to
tell him that his belief system was not correct and that he was tired of coming
to court “over a period of time from dimension to dimension,” having his
feelings put on trial, being sent to a hospital, and being forced to take
medications to try to make him forget his feelings.  He spoke of medicines that he had taken before
that he felt helped him, and he stated that the antipsychotics did not change
his point of view, which was what “this is about” and which was “not right.”  He explained that he had had these feelings
for decades, having gone through “multidimensional realities after being over
it.”  He told the court that he did not
have schizophrenia, but did have major depression and post‑traumatic
stress disorder, and he wanted to take two particular medicines.  He insisted that he did not have delusions.

          The trial court granted the order to administer
psychoactive medication.

Analysis on Remand

          On
appeal, K.E.W.’s argued that the evidence was both legally and factually insufficiency
because the statute governing involuntary commitment for impatient mental
health services requires evidence of a recent overt act that either is actually
harmful or demonstrates that harm to others is imminent.  The
supreme court, however, rejected a reading of the statute that would require the
proposed patient to have engaged in actual dangerous behavior manifested by an
overt act or threats.  315 S.W.3d at
23.  Rather, it held that the statute
requires only an overt act that tends to confirm that a proposed patient is
likely to cause serious harm to others.  Id.; see Tex. Health & Safety Code Ann. § 574.034(d).

          The supreme court construed the
following provisions of Health and Safety Code section 574.034:

(a)  The judge may order a proposed patient to receive
court-ordered temporary inpatient mental health services only if the judge or
jury finds, from clear and convincing evidence, that: 

(1) the proposed patient
is mentally ill; and 

(2) as a result of that
mental illness the proposed patient: 

(A) is likely to cause
serious harm to himself; 

(B) is likely to cause
serious harm to others; or 

(C) is: 

(i) suffering severe and
abnormal mental, emotional, or physical distress; 

(ii) experiencing
substantial mental or physical deterioration of the proposed patient’s ability
to function independently, which is exhibited by the proposed patient’s
inability, except for reasons of indigence, to provide for the proposed
patient’s basic needs, including food, clothing, health, or safety; and 

(iii) unable to make a
rational and informed decision as to whether or not to submit to treatment.

. . . .

(c)  If the judge or jury finds that the proposed
patient meets the commitment criteria prescribed by Subsection (a), the judge
or jury must specify which criterion listed in Subsection (a)(2) forms the
basis for the decision.

(d)  To be clear and convincing under Subsection
(a), the evidence must include expert testimony and, unless waived, evidence of
a recent overt act or a continuing pattern of behavior that tends to confirm: 

(1) the likelihood of
serious harm to the proposed patient or others; or 

(2) the proposed
patient’s distress and the deterioration of the proposed patient’s ability to
function.

 

Texas
Mental Health Code, Tex. Health &
Safety Code Ann. §
574.034(a), (c), (d) (Vernon 2010) (emphasis added).

          Construing the term “overt act” in
section 574.034(d), the court concluded there was no indication that the
legislature intended to limit the term to physical conduct as opposed to any
other action objectively perceivable, including verbal statements.  315 S.W.3d at 22.  It held that “a proposed patient’s words are
overt acts within the meaning of Section 574.034(d).”  Id.  Moreover, the statute permits “the law’s
intervention to prevent serious injury to others” when a person with a mental
illness makes statements that foreshadow violence.”  Id.  Statements made by a proposed patient “can be
relevant both to determining whether he is mentally ill and also to predicting
what actions he might or will take in the future as a result of the mental
illnesss.”  Id.  The statutory language does
not require that the overt act demonstrate serious harm to others; rather, it is
broad enough to permit commitment even if the person’s oral threat does not
cause physical harm.  Id. at 22.  What the statute does require is evidence of
an overt act that “tends to confirm” the “likelihood” of serious harm to
others.  Id. at 23 (citing Tex.
Health & Safety Code Ann. § 574.034(d)(1)).  The supreme court
specifically rejected a reading of the statute that required the proposed
patient to have engaged in actual dangerous behavior manifested by an overt act
or threats.  315 S.W.3d at 23–24.  The court summarized the State’s burden of
proof as follows:

the statute requires evidence
of a recent act by the proposed patient, either physical or verbal, that can be
objectively perceived and that is to some degree probative of a finding that
serious harm to others is probable if the person is not treated.  The overt act itself need not be of such
character that it alone would support a finding of probable serious harm to
others.

 

Id. at 24.

          With that construction in mind, we
consider K.E.W.’s factual‑sufficiency issue on remand.  In a factual‑sufficiency challenge, the
burden of proof at trial necessarily affects appellate review.  In re
C.H., 89 S.W.3d 17, 25 (Tex. 2002). 
When the burden of proof is by clear and convincing evidence, the
standard for factual‑sufficiency review is whether the evidence is such
that the fact‑finder could reasonably form a firm belief or conviction as
to the truth of the State’s allegations. 
Id.  A court of appeals should consider whether
disputed evidence is such that a reasonable fact‑finder could not have
resolved that disputed evidence in favor of its finding.  In re
J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). 
If, in light of the entire record, the disputed evidence that a
reasonable fact‑finder could not have credited in favor of the finding is
so significant that a fact‑finder could not reasonably have formed a firm
belief or conviction, then the evidence is factually insufficient.  Id.
 A court of appeals should detail in its
opinion why it has concluded that a reasonable fact‑finder could not have
credited disputed evidence in favor of the finding.  Id.
at 266–67.

          The record in these cases contains
ample evidence of recent
overt acts by K.E.W. that can be objectively perceived and that are probative
of the trial court’s finding that serious harm to others was probable if K.E.W.
was not treated.  Michael Fields, an employee of the Gulf Coast Center
MHMR where K.E.W. was searching for his stepdaughter, testified at the commitment
hearing that he was present when K.E.W. came into the Center on the day of the
incident.  When asked to “describe what
behaviors you saw him engage in,” he testified:

[Mr. Fields]:           He was - - he appeared to be extremely
paranoid.  He was difficult to
redirect.  I noticed a lot of pacing on
his part.  He was also asking numerous
times for a certain female staff that worked there, and we ended up having to
place her in the back behind a closed door until we were able to have [K.E.W.]
escorted off by the mental health deputies. . . .

          . . . .

[The State]:  As
a result of those behaviors you had to call the police?

[Mr. Fields]:           Yes, the police were called out and at one
point they had to place him in the back of the vehicle because, again, he was uncooperative.  And I am assuming that was probably for his
safety as well as others.

 

          Dr.
Stone, one of K.E.W.’s treating psychiatrists, testified that he evaluated
K.E.W. when he was involuntarily committed and that K.E.W. suffered from
schizophrenia.  When asked on cross‑examination
whether he could give an example of “either his behaviors or what he said
directly to you” that led him to the opinion K.E.W. was a danger to others, Dr.
Stone testified:

          [Dr.
Stone]:  Yes.  He has said to me on several occasions in
talking to him that he believes that there are a flock or group of women,
including his step-daughter, who he is - - who he needs to find and
impregnate.  He needs to find these women
and impregnate them.  He said he needs to
marry his step-daughter and impregnate her, as well.

                    .
. . .

          [The
State]: Any other behaviors that alerted
you or makes you believe that he could be a harm to others?

          [Dr.
Stone]: One of the reasons he was brought
here in the MHMR appointment on the day he was admitted here he was meeting
with Doctor Pugh and Doctor Pugh, he was very threatening to the point Doctor
Pugh felt he needed to be admitted here immediately.

                    .
. . .

          [The
State]:  Because of his delusions is the
delusion such he could harm others?

          [Dr.
Stone]:  Yes.  He has a very firm belie[f] that there are
these women he needs to track down and impregnate.  That he feels very strongly about this.  This is either a mission he needs to be on or
in some ways compelled to do this.  But
there are women he needs to track down and impregnate them.  I am concerned in his delusional state,
because he is very delusional, that he will act on this.  He has been out of the State hospital for a
relatively brief period of time and my concern is with these delusions active
still that he is very likely to act on them. 
I am very concerned if he were to find a female that he believed was
promised him that he would then try to impregnate her.

 

          Dr.
Stone also testified to K.E.W.’s inability to function independently:

          [K.E.W.’s
lawyer]:  You said he was not capable of
functioning independently and you didn’t give details why it was you said that.

          [Dr.
Stone]:  It’s because I believe that he,
first of all, does not believe he has a mental illness does not understand he
has a mental illness; that he is very set on continuing to work on what he
feels are the needs to find these people and have his flock of women and
impregnate them.  He is very concerned
with his delusions.  I don’t think he can
function outside a hospital setting at this time.

 

Dr. Stone also testified to his
belief that women in society in general would be at risk if K.E.W. were not
treated.  He testified,

In fact on the unit we’re very careful when female medical staff go to
talk to him to keep the door open.  Not
because he is homicidal, but in his confused belief he could believe a woman is
there and someone promised to him that does want to be impregnated.

 

          In
addition, Dr. Ortiz, another of K.E.W.’s treating psychiatrists, testified that
he had seen K.E.W. daily during the week preceding the hearing.  When asked to testify what he had seen in
general, he replied:

          [Dr.
Ortiz]:  With him in general there was
the particular concern regarding the women, and I wanted to know more about his
particular beliefs regarding that.  And
what I noticed is that he would become very agitated regarding the belief of
the women.  For instance, when he was in
the emergency room he experienced - - I say “experienced” because it’s unclear
if he heard it or just information that was provided to him, but he experienced
the knowledge that some of the women that he was seeking were actually in the
emergency room and that he had just missed them and that certain staff members
in the emergency room had that information about where their whereabouts were
and they were withholding that information from him and that it was some sort
of conspiracy to keep those women.  So he
was very upset because he had just missed them.

          [The
State]:  How did he act when he was
upset?

                    [Dr. Ortiz]:  I wasn’t present in the emergency room but
according to the clinical record he became very agitated.

          . . . .

          [The
State]:  His behavior was of agitation?

          [Dr.
Ortiz]:  Yes.

          [The
State]:  Did you see the same type of
agitation on the unit when you met with him personally?

          [Dr.
Ortiz]:  Not to the degree that was
described in the medical record, and I say that because of the emergency room
setting he required PRN medications at that time.  In the times where I personally interacted
with him he became agitated in that his body status was very tense.  He was very intrusive.  He invaded my space on several occasions
because it was very important to him to stress that he needed to leave from
here.  And there were also additional
times where he had an experience where he heard or experienced that I knew
where the women were located.  And when I
continually denied that, I knew then he was convinced that I was able to access
these special agents that would have the key that would take him to the portal
where some of the women were particularly located at.

          [The
State]:  How did he convey that to you?

          [Dr.
Ortiz]:           He
told me.

          . . . .

          [The
State]:  You wrote a narrative, you have
memorialized as of April 21 some findings and some recommendations.  Do you recall writing a narrative?

          [Dr.
Ortiz]:  Yes.

          [The
State]:  In that narrative you indicated
on the second page, “The potential dangerousness of this behavior is concerning
to the treatment team.”  What behavior
did you think was a potential danger?

          [Dr.
Ortiz]:  The two behaviors were, one, the
women themselves.  They are actually on
his person because some of the papers I have on the chart were from papers he
himself wanted me to share with the Court. 
And so I made copies of that for the record which has several of the
names of the women he is searching for. 
One of them is his step-daughter. 
He has a picture of her in her person and he showed them.  I saw pictures of the step-daughter when she
was age four or five and I have also seen her as an adult.

          Those
are one of the women that he was searching for. 
I don’t know - - my concern with those specific women, I don’t know if
the sexual interaction that would occur if he were to find them would be
consensual or not.  And because he has
very intrusive I don’t know he would understand no means no, given his state of
mind at the time.

          The
other concern that I had was related to his misperception regardless how he got
that information, whether he heard it from brain waves or - - because he has
these special abilities, from what he tells me. 
I don’t know if he perceives or misperceives certain information he can
get very angry and agitated.

          The
unit is a very organized and safe setting so a lot of things that could have
happened in the external world haven’t happened because of that order.  My concern is if he is in another situation
given another stimulus, perhaps something would happen, and I wasn’t convinced
it wouldn’t.  That’s what was concerning.

 

          There is undisputed evidence that K.E.W.’s
behavior at the MHMR clinic was perceived by all around him as likely to cause
serious harm to women including his stepdaughter and a staff employee of the
MHMR clinic if he were not to receive court‑ordered temporary inpatient
mental health services.  Moreover, the
expert testimony of the treating physicians confirmed K.E.W.’s mental illness
and ongoing overt acts, including oral statements, that foreshadowed acts of
violence he might take in the future with respect to women in general whom, in
his illness, he might identify as members of his flock.  See
315 S.W.3d at 25–26.  K.E.W. does not
point to any evidence undermining the trial court’s determination other than
the lack of an overt act by him that actually harmed someone or placed an
individual in imminent danger.

          After reviewing the entire record, we hold the evidence is such that the fact‑finder
could reasonably form a firm belief or conviction as to the truth of the State’s
allegations that K.E.W. was likely to cause serious harm to others.  Accordingly, we overrule K.E.W.’s factual‑sufficiency
challenge to the trial court’s order for temporary inpatient mental health
services.  We also overrule K.E.W.’s
factual‑sufficiency challenge to the trial court’s order for the
administration of psychoactive medication, as K.E.W. attacked that order solely
on the ground that K.E.W. was not subject to a valid order for temporary
services.  See Tex. Health & Safety
Code Ann. §
574.106(a)(1) (Vernon 2010).

Conclusion

          The Texas Supreme Court has held that
the evidence is legally sufficient to support both the trial court’s order for
temporary inpatient mental health services for K.E.W. and its order for the
administration of psychoactive medication. 
315 S.W.3d at 27.  Having held on
remand that the evidence is also factually sufficient, we affirm both orders.

 

 

                                                                   Evelyn
V. Keyes

                                                                   Justice


 

Panel consists of Justices Keyes, Higley, and Bland.











[1]           Trial court case number
3318; appellate case number 01‑08‑00371‑CV.

 





[2]           Trial court case number 3318A;
appellate case number 01‑08‑00372‑CV.