333 S.W.3d 850 (2010)
K.E.W., Appellant,
v.
The STATE of Texas, Appellee.
Nos. 01-08-00371-CV, 01-08-00372-CV.
Court of Appeals of Texas, Houston (1st Dist.).
December 30, 2010.
*851 Richard H. Branson, League City, TX, for Appellant.
Donald S. Glywasky, Galveston County Legal Department, Robert V. Shattuck, Jr., Attorney at Law, Roger L. Ezell, Criminal District Attorney, Galveston, TX, for Appellee.
Panel consists of Justices KEYES, HIGLEY, and BLAND.

OPINION
EVELYN V. KEYES, Justice.
In these accelerated appeals, the trial court signed orders to commit appellant K.E.W. for temporary mental health services[1] and for the administration of psychoactive medication.[2]See Texas Mental Health Code, TEX. HEALTH & SAFETY CODE ANN. §§ 574.034, .070, .106(a)(1) (Vernon 2010). A divided panel of this Court held there was legally insufficient evidence to support the two orders, reversed the trial court's orders, and rendered judgments in K.E.W.'s favor. K.E.W. v. State, 276 S.W.3d 686, 700 (Tex.App.-Houston [1st Dist.] 2008), rev'd, 315 S.W.3d 16 (Tex. 2010). The Supreme Court of Texas held the evidence was legally sufficient, reversed our judgments, and remanded the cases to this Court to consider K.E.W.'s factual-sufficiency complaints. 315 S.W.3d at 27. We affirm.

Background
On April 17, 2008, K.E.W., a patient of Gulf Coast Center Mental Health and Mental Retardation ("MHMR") who had previously been diagnosed as schizophrenic, went in for an appointment that he had made. Although a regular patient, he had not been seen by the staff since the prior October. While at the Gulf Coast Center, K.E.W. informed the staff that he had a plan to impregnate multiple women and asked repeatedly for a particular female staff member, his adult stepdaughter, whom he stated that he wanted to impregnate. The staff became concerned with his extremely paranoid behavior and his attempts to interfere with female staff even though he was directed otherwise. The staff ultimately placed the female staff member behind a closed door until K.E.W. *852 could be escorted away by the police. K.E.W. would not stand still or listen to others and was walking in and around the building, pacing and smoking, refusing to stop or calm down. Dr. Pugh, the physician who saw him for the appointment, believed that K.E.W. did not have an appropriate insight into his situation and might be a danger to others and called the police. When the police arrived, K.E.W. was uncooperative, and he was placed in the back of the police car and escorted to the hospital at The University of Texas Medical Branch at Galveston.
At the hospital, K.E.W. explained to doctors that aliens had put a computer chip in his abdomen and right ring finger and that he was chosen to help populate a new and better race of humans. His goal was to search and find as many women as he could to procreate quickly, and he had a firm belief that there was a flock or group of women whom he needed to find and impregnate, one of whom was his adult stepdaughter. He believed that some of the women for whom he was searching had been at or near the hospital when he was brought into the emergency room and that the hospital staff had known that and discussed it but had withheld information from him about it, and he was very angry at the staff for not giving him the information he needed. He became very agitated and insisted that he needed to leave in order to complete his mission and asked the treatment team to help him contact the women. He was diagnosed as having schizoaffective disorder, specifically being paranoid schizo-chronic.
The State applied for court-ordered temporary mental health services and for an order to administer psychoactive medication. At the hearing on the State's application for temporary commitment, in addition to limited testimony from two members of the Gulf Coast Center's staff about the events that led to K.E.W.'s hospitalization and testimony about appellant's medical records, there was testimony from Dr. Michael Stone and Dr. Waleska Ortiz. Both were physicians who met with K.E.W. at the hospital after he was taken there from the Gulf Coast Center.
Dr. Stone stated that he did a psychiatric evaluation of K.E.W. and determined that K.E.W. was suffering from mental illness and had been diagnosed as schizophrenic. He testified that K.E.W. demonstrated that he was a danger to others, citing K.E.W.'s statements to him on several occasions that there was a flock or group of women, including his stepdaughter, whom K.E.W. needed to find and impregnate. Dr. Stone also believed that K.E.W. could be a danger to others because, during the meeting with Dr. Pugh, the doctor with whom K.E.W. had the appointment at MHMR, K.E.W. "was very threatening to the point [that] Dr. Pugh felt [K.E.W.] needed to be admitted [to the hospital] immediately." Dr. Stone admitted that he had not verified the existence of any of the women whom K.E.W. claimed he wished to impregnate and, as far as he knew, K.E.W. had taken no concrete steps to find them, although K.E.W. had a plan to carry out the creation of a new society and carried papers about the plan with him. Dr. Stone also admitted that K.E.W. said that he was not planning on impregnating the women against their will, but he was concerned as to whether K.E.W. would understand what a woman would consider to be against her will. He agreed that the only group K.E.W. was a danger to was these women and women in society in general because K.E.W., in his confused belief, might mistakenly believe that a woman was one who was promised to him and wanted to be impregnated.
*853 Dr. Ortiz testified that, while in the hospital, K.E.W. became agitated regarding the women he was seeking. She detailed an incident where K.E.W. believed that some of the women he was seeking had been in the emergency room and that he had just missed them. K.E.W. believed that the hospital staff, including Dr. Ortiz, knew this and had information regarding where the women were, but were withholding it from him. He thought that he heard Dr. Ortiz and the nurses laughing about how he had just missed the women, thought it was a conspiracy against him, and was very upset. He was convinced that Dr. Ortiz was able to access special agents who would have the key that would take him to the portal where the women were located. He also told Dr. Ortiz that he had the ability to hear thoughts through special frequencies and told her that he may have heard or perceived that she was probably lying to him.
Dr. Ortiz was concerned about two behaviors of K.E.W. as potentially dangerous. The first was the potential for nonconsensual sexual interaction with the specific women he sought, if he were to find them. She testified that K.E.W. was very intrusive, that he invaded her space on several occasions, and that she did not know if he would understand that "no" meant "no," given his state of mind at the time. However, she admitted that K.E.W. did not state that he intended to impregnate anyone against her will and did not make sexual advances towards anyone on the staff. Dr. Ortiz's second concern was related to K.E.W.'s misperception that he received information from brain waves or special abilities. Dr. Ortiz feared that K.E.W. could get very angry and agitated if he perceived or misperceived certain information. She thought that the hospital unit was organized and safe but, if K.E.W. was in another situation, with another stimulus, "perhaps something would happen."
K.E.W. put on no testimony or evidence.
The trial court found that K.E.W. was suffering from mental illness and, as a result of that mental illness, was likely to cause serious harm to others. The court also found that K.E.W. was suffering from severe and abnormal mental, emotional, and physical distress, and ordered him committed to the Austin State Hospital for inpatient care not to exceed 90 days. In its written order, the trial court stated that it found, by clear and convincing evidence, that K.E.W. was mentally ill, and that, as a result of that mental illness, K.E.W. was "likely to cause harm to others," was "suffering severe and abnormal mental, emotional, or physical distress," was "experiencing substantial mental or physical deterioration of his ability to function independently, which [was] exhibited by [K.E.W.'s] inability, except for reasons of indigence, to provide for his basic needs, including food, clothing, health, or safety," and was "unable to make a rational and informed decision as to whether or not to submit to treatment."
The court then held a hearing on the administration of psychoactive medication. The State called Dr. Stone, who testified that K.E.W. was taking some medications ordered for him and refusing others, and that, in Dr. Stone's opinion, K.E.W. was not capable of understanding the need for medication because of his mental illness. Dr. Stone testified that K.E.W. did not really believe that he needed medication and that he only agreed to take one medication, which Dr. Stone was not sure was working. Dr. Stone stated that there was no other alternative treatment and that antipsychotics, anxiolytics, sedatives, hypnotic mood stabilizers, and antidepressants would be in K.E.W.'s best interest.
*854 K.E.W. then testified that he thought that doctors were trying to keep him away from the real medicine he neededhis "displaced family and friends that [he] had come from far away to see and a large group of those individuals that they're referring to." That was the "real medication that [would] heal [his] heart, mind, body and soul." He stated that it was wrong for someone to tell him that his belief system was not correct and that he was tired of coming to court "over a period of time from dimension to dimension," having his feelings put on trial, being sent to a hospital, and being forced to take medications to try to make him forget his feelings. He spoke of medicines that he had taken before that he felt helped him, and he stated that the antipsychotics did not change his point of view, which was what "this is about" and which was "not right." He explained that he had had these feelings for decades, having gone through "multidimensional realities after being over it." He told the court that he did not have schizophrenia, but did have major depression and post-traumatic stress disorder, and he wanted to take two particular medicines. He insisted that he did not have delusions.
The trial court granted the order to administer psychoactive medication.

Analysis on Remand
On appeal, K.E.W.'s argued that the evidence was both legally and factually insufficiency because the statute governing involuntary commitment for impatient mental health services requires evidence of a recent overt act that either is actually harmful or demonstrates that harm to others is imminent. The supreme court, however, rejected a reading of the statute that would require the proposed patient to have engaged in actual dangerous behavior manifested by an overt act or threats. 315 S.W.3d at 23. Rather, it held that the statute requires only an overt act that tends to confirm that a proposed patient is likely to cause serious harm to others. Id.; see TEX. HEALTH & SAFETY CODE ANN. § 574.034(d).
The supreme court construed the following provisions of Health and Safety Code section 574.034:
(a) The judge may order a proposed patient to receive court-ordered temporary inpatient mental health services only if the judge or jury finds, from clear and convincing evidence, that:
(1) the proposed patient is mentally ill; and
(2) as a result of that mental illness the proposed patient:
(A) is likely to cause serious harm to himself;
(B) is likely to cause serious harm to others; or
(C) is:
(i) suffering severe and abnormal mental, emotional, or physical distress;
(ii) experiencing substantial mental or physical deterioration of the proposed patient's ability to function independently, which is exhibited by the proposed patient's inability, except for reasons of indigence, to provide for the proposed patient's basic needs, including food, clothing, health, or safety; and
(iii) unable to make a rational and informed decision as to whether or not to submit to treatment.
....
(c) If the judge or jury finds that the proposed patient meets the commitment criteria prescribed by Subsection (a), the judge or jury must specify which criterion listed in Subsection (a)(2) forms the basis for the decision.

*855 (d) To be clear and convincing under Subsection (a), the evidence must include expert testimony and, unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends to confirm:

(1) the likelihood of serious harm to the proposed patient or others; or
(2) the proposed patient's distress and the deterioration of the proposed patient's ability to function.
Texas Mental Health Code, TEX. HEALTH & SAFETY CODE ANN. § 574.034(a), (c), (d) (Vernon 2010) (emphasis added).
Construing the term "overt act" in section 574.034(d), the court concluded there was no indication that the legislature intended to limit the term to physical conduct as opposed to any other action objectively perceivable, including verbal statements. 315 S.W.3d at 22. It held that "a proposed patient's words are overt acts within the meaning of Section 574.034(d)." Id. Moreover, the statute permits "the law's intervention to prevent serious injury to others" when a person with a mental illness makes statements that foreshadow violence." Id. Statements made by a proposed patient "can be relevant both to determining whether he is mentally ill and also to predicting what actions he might or will take in the future as a result of the mental illness." Id. The statutory language does not require that the overt act demonstrate serious harm to others; rather, it is broad enough to permit commitment even if the person's oral threat does not cause physical harm. Id. at 22. What the statute does require is evidence of an overt act that "tends to confirm" the "likelihood" of serious harm to others. Id. at 23 (citing TEX. HEALTH & SAFETY CODE ANN. § 574.034(d)(1)). The supreme court specifically rejected a reading of the statute that required the proposed patient to have engaged in actual dangerous behavior manifested by an overt act or threats. 315 S.W.3d at 23-24. The court summarized the State's burden of proof as follows:
the statute requires evidence of a recent act by the proposed patient, either physical or verbal, that can be objectively perceived and that is to some degree probative of a finding that serious harm to others is probable if the person is not treated. The overt act itself need not be of such character that it alone would support a finding of probable serious harm to others.
Id. at 24.
With that construction in mind, we consider K.E.W.'s factual-sufficiency issue on remand. In a factual-sufficiency challenge, the burden of proof at trial necessarily affects appellate review. In re C.H., 89 S.W.3d 17, 25 (Tex.2002). When the burden of proof is by clear and convincing evidence, the standard for factual-sufficiency review is whether the evidence is such that the fact-finder could reasonably form a firm belief or conviction as to the truth of the State's allegations. Id. A court of appeals should consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d 256, 266 (Tex.2002). If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. Id. A court of appeals should detail in its opinion why it has concluded that a reasonable fact-finder could not have credited disputed evidence in favor of the finding. Id. at 266-67.
The record in these cases contains ample evidence of recent overt acts by *856 K.E.W. that can be objectively perceived and that are probative of the trial court's finding that serious harm to others was probable if K.E.W. was not treated. Michael Fields, an employee of the Gulf Coast Center MHMR where K.E.W. was searching for his stepdaughter, testified at the commitment hearing that he was present when K.E.W. came into the Center on the day of the incident. When asked to "describe what behaviors you saw him engage in," he testified:
[Mr. Fields]: He washe appeared to be extremely paranoid. He was difficult to redirect. I noticed a lot of pacing on his part. He was also asking numerous times for a certain female staff that worked there, and we ended up having to place her in the back behind a closed door until we were able to have [K.E.W.] escorted off by the mental health deputies....
....
[The State]: As a result of those behaviors you had to call the police? [Mr. Fields]: Yes, the police were called out and at one point they had to place him in the back of the vehicle because, again, he was uncooperative. And I am assuming that was probably for his safety as well as others.
Dr. Stone, one of K.E.W.'s treating psychiatrists, testified that he evaluated K.E.W. when he was involuntarily committed and that K.E.W. suffered from schizophrenia. When asked on cross-examination whether he could give an example of "either his behaviors or what he said directly to you" that led him to the opinion K.E.W. was a danger to others, Dr. Stone testified:
[Dr. Stone]: Yes. He has said to me on several occasions in talking to him that he believes that there are a flock or group of women, including his step-daughter, who he iswho he needs to find and impregnate. He needs to find these women and impregnate them. He said he needs to marry his step-daughter and impregnate her, as well.
....
[The State]: Any other behaviors that alerted you or makes you believe that he could be a harm to others?
[Dr. Stone]: One of the reasons he was brought here in the MHMR appointment on the day he was admitted here he was meeting with Doctor Pugh and Doctor Pugh, he was very threatening to the point Doctor Pugh felt he needed to be admitted here immediately.
....
[The State]: Because of his delusions is the delusion such he could harm others?
[Dr. Stone]: Yes. He has a very firm belie[f] that there are these women he needs to track down and impregnate. That he feels very strongly about this. This is either a mission he needs to be on or in some ways compelled to do this. But there are women he needs to track down and impregnate them. I am concerned in his delusional state, because he is very delusional, that he will act on this. He has been out of the State hospital for a relatively brief period of time and my concern is with these delusions active still that he is very likely to act on them. I am very concerned if he were to find a female that he believed was promised him that he would then try to impregnate her.
Dr. Stone also testified to K.E.W.'s inability to function independently:
[K.E.W.'s lawyer]: You said he was not capable of functioning independently and you didn't give details why it was you said that.
[Dr. Stone]: It's because I believe that he, first of all, does not believe he *857 has a mental illness does not understand he has a mental illness; that he is very set on continuing to work on what he feels are the needs to find these people and have his flock of women and impregnate them. He is very concerned with his delusions. I don't think he can function outside a hospital setting at this time.
Dr. Stone also testified to his belief that women in society in general would be at risk if K.E.W. were not treated. He testified,
In fact on the unit we're very careful when female medical staff go to talk to him to keep the door open. Not because he is homicidal, but in his confused belief he could believe a woman is there and someone promised to him that does want to be impregnated.
In addition, Dr. Ortiz, another of K.E.W.'s treating psychiatrists, testified that he had seen K.E.W. daily during the week preceding the hearing. When asked to testify what he had seen in general, he replied:
[Dr. Ortiz]: With him in general there was the particular concern regarding the women, and I wanted to know more about his particular beliefs regarding that. And what I noticed is that he would become very agitated regarding the belief of the women. For instance, when he was in the emergency room he experiencedI say "experienced" because it's unclear if he heard it or just information that was provided to him, but he experienced the knowledge that some of the women that he was seeking were actually in the emergency room and that he had just missed them and that certain staff members in the emergency room had that information about where their whereabouts were and they were withholding that information from him and that it was some sort of conspiracy to keep those women. So he was very upset because he had just missed them.
[The State]: How did he act when he was upset?
[Dr. Ortiz]: I wasn't present in the emergency room but according to the clinical record he became very agitated.
....
[The State]: His behavior was of agitation?
[Dr. Ortiz]: Yes.
[The State]: Did you see the same type of agitation on the unit when you met with him personally?
[Dr. Ortiz]: Not to the degree that was described in the medical record, and I say that because of the emergency room setting he required PRN medications at that time. In the times where I personally interacted with him he became agitated in that his body status was very tense. He was very intrusive. He invaded my space on several occasions because it was very important to him to stress that he needed to leave from here. And there were also additional times where he had an experience where he heard or experienced that I knew where the women were located. And when I continually denied that, I knew then he was convinced that I was able to access these special agents that would have the key that would take him to the portal where some of the women were particularly located at.
[The State]: How did he convey that to you?
[Dr. Ortiz]: He told me.
....
[The State]: You wrote a narrative, you have memorialized as of April 21 some findings and some recommendations. *858 Do you recall writing a narrative?
[Dr. Ortiz]: Yes.
[The State]: In that narrative you indicated on the second page, "The potential dangerousness of this behavior is concerning to the treatment team." What behavior did you think was a potential danger?
[Dr. Ortiz]: The two behaviors were, one, the women themselves. They are actually on his person because some of the papers I have on the chart were from papers he himself wanted me to share with the Court. And so I made copies of that for the record which has several of the names of the women he is searching for. One of them is his step-daughter. He has a picture of her in her person and he showed them. I saw pictures of the step-daughter when she was age four or five and I have also seen her as an adult.
Those are one of the women that he was searching for. I don't knowmy concern with those specific women, I don't know if the sexual interaction that would occur if he were to find them would be consensual or not. And because he has very intrusive I don't know he would understand no means no, given his state of mind at the time.
The other concern that I had was related to his misperception regardless how he got that information, whether he heard it from brain waves orbecause he has these special abilities, from what he tells me. I don't know if he perceives or misperceives certain information he can get very angry and agitated.
The unit is a very organized and safe setting so a lot of things that could have happened in the external world haven't happened because of that order. My concern is if he is in another situation given another stimulus, perhaps something would happen, and I wasn't convinced it wouldn't. That's what was concerning.
There is undisputed evidence that K.E.W.'s behavior at the MHMR clinic was perceived by all around him as likely to cause serious harm to women including his stepdaughter and a staff employee of the MHMR clinic if he were not to receive court-ordered temporary inpatient mental health services. Moreover, the expert testimony of the treating physicians confirmed K.E.W.'s mental illness and ongoing overt acts, including oral statements, that foreshadowed acts of violence he might take in the future with respect to women in general whom, in his illness, he might identify as members of his flock. See 315 S.W.3d at 25-26. K.E.W. does not point to any evidence undermining the trial court's determination other than the lack of an overt act by him that actually harmed someone or placed an individual in imminent danger.
After reviewing the entire record, we hold the evidence is such that the factfinder could reasonably form a firm belief or conviction as to the truth of the State's allegations that K.E.W. was likely to cause serious harm to others. Accordingly, we overrule K.E.W.'s factual-sufficiency challenge to the trial court's order for temporary inpatient mental health services. We also overrule K.E.W.'s factual-sufficiency challenge to the trial court's order for the administration of psychoactive medication, as K.E.W. attacked that order solely on the ground that K.E.W. was not subject to a valid order for temporary services. See TEX. HEALTH & SAFETY CODE ANN. § 574.106(a)(1) (Vernon 2010).

Conclusion
The Texas Supreme Court has held that the evidence is legally sufficient to support both the trial court's order for temporary *859 inpatient mental health services for K.E.W. and its order for the administration of psychoactive medication. 315 S.W.3d at 27. Having held on remand that the evidence is also factually sufficient, we affirm both orders.
NOTES
[1] Trial court case number 3318; appellate case number 01-08-00371-CV.
[2] Trial court case number 3318A; appellate case number 01-08-00372-CV.