

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00380-CV
No. 02-19-00381-CV

———————————————

IN THE MATTER OF A.D.

On Appeal from County Court at Law No. 1
Wichita County, Texas
Trial Court Nos. CCL1-MH2019-0359; CCL1-MH2019-0423

Before Gabriel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Gabriel

## MEMORANDUM OPINION

In these preferential and accelerated appeals, appellant A.D. seeks relief from the trial court's (1) order to authorize psychoactive medication and (2) order granting temporary inpatient mental-health services and committing her to the North Texas State Hospital (NTSH). *See* Tex. Health & Safety Code Ann. §§ 574.070, 574.108; Tex. R. App. P. 28.1(a). In two issues, she argues that the evidence is legally and factually insufficient to support the commitment order, which also mandates reversal of the psychoactive-medication order. We conclude that the evidence, although conflicting, was sufficient to support the order for temporary mental-health services and that the psychoactive-medication order, therefore, may also stand.

## I. BACKGROUND

A.D. was committed to NTSH in March 2019 after she stopped eating for five days, drinking only water and coffee, and would not come inside her house because she believed she had been infected with lice. By April 8, A.D.'s symptoms "remitted," and she was discharged. But her symptoms "recurred several times."

On September 16, 2019, A.D.'s husband Mike filed an application for A.D.'s emergency detention. *See* Tex. Health & Safety Code Ann. § 573.011. In his affidavit, Mike stated A.D. showed a substantial risk of harming herself or others: "Stays up for days at a time, drinks out of the [non-potable] water. Thinks she has super lice, will not see the doctor or take her medication. H[ears] her old boyfriends talking to her through the radio. God has told her to kill the neighborhood cats, which gave her

2

lice." Mike also affirmed that the risk of harm was imminent unless A.D. was immediately restrained: "Threatened her parents and sister. Killed frogs and gave them to our neighbor at night. Bath[e]s, but doesn't use soap because it is poison. Sometimes will not eat for days (fasting). Our 10 year old daughter is scared of her mother!!" The district attorney filed a motion for protective custody and an application for court-ordered mental-health services, attaching a certificate of medical examination for mental illness by Dr. C.E. Llauger Mier. *See id.* §§ 574.001, 574.009, 574.011.

Mier certified that his "brief diagnosis" of A.D. after assessing her condition on September 16 was that she suffered from nonspecific psychosis; was likely to cause serious harm to herself or others; and was suffering severe and abnormal mental, emotional, or physical distress. Mier detailed the bases of his opinion:

> Client is not eating, drinking brown water, sleeping outside. Killing animals and throwing them in neighbor[']s yard. She thinks she is covered in lice. Has a paranoia with husband. 'He is petting cats with lice and then touches me.' Also God gave her the mission to kill cats in neighborhood.

In his supporting affidavit, Mier delineated A.D.'s statements and actions that led to his recommendation to admit A.D. to NTSH, including her belief that the sheriff and firefighters were conspiring to hurt her and that she was aggressive toward her 25-year-old daughter. Mier concluded that A.D. was delusional, aggressive, paranoid, moody, labile, and hallucinatory.

A magistrate ordered A.D. into protective custody, finding that A.D. presented a substantial risk of serious harm to herself or others if not immediately restrained. *See id.* § 574.022. The magistrate also ordered the preparation of an alternative treatment recommendation (ATR). *See id.* § 574.012.

On September 24, Dr. Peter Fadow filed a certificate of medical examination for mental illness based on his September 20 examination of A.D. *See id.* §§ 574.009, 574.011. Fadow diagnosed A.D. with bipolar I disorder with psychotic features and a severe manic phase. Fadow opined that A.D. was likely to cause serious harm to herself; was suffering severe and abnormal mental, emotional, or physical distress; and was unable to function independently based on the following facts:

> Patient has symptoms of mania and psychosis. She has acted on delusional thought and has severely restricted her food intake endangering her health. She [weighed] 116lbs in April 2019 [during] her last admission. She now weigh[s] 96lbs and has a body ma[ss] index of 14.69. Normal BMI is 18 to 25. Patient noted by husband to drink from a fish pond on the property where she lives. Patient admits shooting a BB gun towards feral cats on her property because she believes they have given her an infection with "super lice[.]"

In his supporting affidavit, Fadow included A.D.'s statements about the cats and her reticence to eat: "I shoot the BB gun at the cats and any dogs. I will try to hit metal around them. I try to make a popping sound[]. I've been killing frogs. They are slimy and they damage my herbal garden with slime. I can't eat soy. It's in all bread I won't eat it." Fadow noted that A.D. was alert but that she was irritable and that her

4

speech was "pressured, contains paranoid delusions and derails." Fadow recommended a temporary commitment to NTSH.

That same day, Fadow filed an application for an order to authorize psychoactive medications based on her mania, delusions, and psychosis, leading to "significant malnutrition." *See id.* § 574.104. Fadow believed that A.D. did not have the capacity to make a decision about medication and that medication would lead to a remission of her symptoms and remove the danger to her health.

On September 26, a "Continuity Care Coordinator" filed an ATR that A.D. be hospitalized in NTSH for 90 days. The recommendation was based on the coordinator's September 23 interview of A.D. The coordinator noted that A.D. was alert, oriented, stable, and had appropriate affect; however, he recognized that A.D. "continue[d] to refuse medications to treat her psychosis" and that her insight and judgment were "limited." It had been reported to the coordinator, presumably by Mike, that A.D. smoked home-grown marijuana six times a day.

The trial court set a hearing on both applications for September 30. At the start of the hearing, the trial court took judicial notice of the parties' prior filings, including the certificates of medical examination and the ATR. *See generally In re C.S.*, 208 S.W.3d 77, 81 (Tex. App.—Fort Worth 2006, pet. denied) (recognizing judicial notice may be taken of the court's filings but not of the truth of any facts alleged in those filings). Fadow testified to many of the facts contained in his certificate of medical examination and in the ATR.

5

Fadow explained that A.D. was malnourished and had been fasting while at NTSH. A.D. should weigh between 135 and 140 pounds. When the application for court-ordered mental-health services was filed, A.D. weighed 96 pounds;[1] on the day of the hearing, she weighed 102.5 pounds with a BMI of 15.[2] She told Fadow that she would not eat processed food, legumes, or soy products because of food allergies caused by a blood transfusion she had during a gastrointestinal surgery in 2005 and because God had commanded her to do so. When twice threatened with a feeding tube, however, A.D. would begin to eat again. No food-allergy symptoms were noted when A.D. resumed eating. Fadow testified that A.D.'s aversion to certain types of foods and belief of food allergies caused by a blood transfusion were paranoid delusions. According to Fadow, any stomach cramps or physical reactions A.D. could have experienced were probably the result of eating after a prolonged period of fasting. Fadow also testified that Mike had reported A.D. would lock their ten-year-old daughter in the bathroom for extended periods of time because A.D. believed her daughter had "somehow wronged her."

Fadow opined that A.D. was unable to make a rational and informed decision about medications based on her mental illness and that court-ordered medications would be in her best interest. The risks and benefits of the proposed medications had

---

[1]This was a 20 pound loss from her admission to NTSH six months earlier.

[2]A.D. testified she weighed 104.7 pounds at the hearing with a BMI of "just less than 21 percent."

been explained to A.D., but she was unable to appreciate them. Fadow testified that her current symptoms would not resolve without pharmacological intervention, unlike her prior hospitalization:

> She told me that she smokes marijuana three times a day and she has a strong smell of something had burned near her, and I believe that - - and this is based on some of the information the husband provided. She's always had cyclic mood disturbance, but in March this is the first time that the combination of heavy use of marijuana with her bipolar disorder has led to a hospitalization, and a significant event where she is sitting in the sun and risked injury to herself. Fortunately it resolved when she stopped using the marijuana. At this time it's not resolving as well, and that's why I think she'll continue to be psychotic and her mood will continue to be significantly impaired and she needs the help of medications to help resolve it this time.

Fadow stated that there was no alternative to the medications to treat A.D.'s symptoms. Without the requested medications, A.D. will be psychotic, will likely continue to fast and to put her health at risk, and could focus on others at NTSH in order to harm them.

A.D. testified and disputed much of Fadow's testimony. She denied locking her daughter in the bathroom for extended periods, but A.D. admitted that she would put her 10-year-old daughter in the bathroom for ten minutes to allow her to read because it was a "good reading technique."[3] She explained that she and Mike had marital problems because Mike was "disloyal," which caused her to cry "for two years."

---

[3]A.D. homeschooled her 10-year-old daughter.

A.D. stated that she resumed eating at NTSH because the staff started feeding her better food that she was not allergic to. A.D. stressed that her food allergies were caused by the 2005 transfusion and resulted in severe physical reactions such as stomach cramps. She also explained why she fasted and stayed outside before her most recent hospitalization: "[T]o harvest and prepare tomatoes for hot sauce" and because Mike had locked her outside.

She admitted to smoking marijuana daily but only "1 or 2 puffs three times a day maximum," not the six times per day reported in the ATR. She asserted that she declined the psychoactive medications because of their risk for liver and kidney damage, which was a concern based on her family history. She stated that she would take medications if she were convinced she had a mental illness and if the medications were not "chemically composed." When asked what would make her believe she had a mental illness, A.D. seemed to focus on whether she had harmed someone else but quickly veered off topic:

> If I had harmed someone, if I had flown off the handle without justifiably being angry or being sad or being sorrowful. If I had the respect from my parents that - - please back away, give us respect. We are almost 50. We can handle a marital issue on our own. Our - - my parents, they have the 25-year-old living at their home.[4] I asked her to leave our home. She has a job, she has a healthy bank account of almost $20,000, she was taking advantage in every way. I asked her to please buy her own home. The interest rates had dropped to two and a half percent. She would have been able to have a nice home for what - - prior to the year before, she would have had to have a bank note. We allowed her to stay home and pay her medical - - her college debt. She

[4]It appears that A.D. was referring to her and Mike's older daughter.

received a scholarship, healthy, healthy scholarship. And this - - two years had passed and she still was having us pay her insurance and her phone and she was watching things inappropriate for the ten-year-old. We - - we keep a pretty stern household when it comes to what you're allowed to watch or what you're allowed to - - I asked the 25-year-old to please leave so the ten-year-old would have a normal healthy raising, and not - - not be trying to behave like she was an adult. She's ten. She likes climbing trees and mud pies, play, trampoline and swimming pool. I - - I believe that there's - - there are reasons when you're sorrowful. There are reasons when a husband and a wife need to speak on their own about things. My husband refused to speak to me.

A.D. contended that only she and her attorney were telling the truth and that everyone else involved—Fadow, Mier, Mike, the staff at NTSH, and the continuity care coordinator who prepared the ATR—lied about her actions and mental state.

The trial court found by clear and convincing evidence that A.D., a person with a mental illness, (1) was likely to cause serious harm to herself and (2) was suffering severe and abnormal mental, emotional, or physical distress; experiencing substantial mental or physical deterioration of her ability to function independently, which was exhibited by her inability to provide for her basic needs; and unable to make a rational and informed decision as to whether or not to submit to treatment. *See* Tex. Health & Safety Code Ann. § 574.034(a), (c). The trial court also found by clear and convincing evidence that A.D. lacked the capacity to make a decision regarding the administration of the proposed medications, which were in A.D.'s best interest. *See id.* § 574.106(a–1)(1). Thus, the trial court ordered A.D. committed to NTSH for 90 days and authorized the administration of psychoactive medications. *See id.* §§ 574.036(e), 574.106(g)–(h). A.D. argues that the evidence did not support the order for

9

temporary mental-health services, which eviscerates the basis for the medication order.

## II. SUFFICIENCY OF THE EVIDENCE

### A. STANDARDS OF REVIEW, SCOPE OF REVIEW, AND BURDEN OF PROOF

The State bore the burden of establishing by clear and convincing evidence the statutory requisites for the temporary commitment order and for the court-ordered administration of psychoactive medication. *See id.* §§ 574.034(a), 574.106(a–1). Because of the State's higher burden of proof, we apply a heightened review standard for sufficiency. *See In re M.T.*, Nos. 02-17-00011-CV, 02-17-00012-CV, 2017 WL 1018596, at *5 (Tex. App.—Fort Worth Mar. 16, 2017, no pet.) (per curiam) (mem. op.) (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). Even though the trial court took judicial notice of the certificates of medical examination and the ATR, we may not consider those in our sufficiency review because they were not admitted into evidence at the hearing. *See In re A.J.W.*, Nos. 02-15-00028-CV, 02-15-00029-CV, 2015 WL 1407890, at *4 (Tex. App.—Fort Worth Mar. 26, 2015, pet. denied) (mem. op.). We may consider, however, any facts Fadow testified to that were also included in his certificate or in the ATR.

Regarding legal sufficiency, we determine whether the evidence would allow a fact-finder to reasonably form a firm belief or conviction regarding the truth of the allegations sought to be established. *See M.T.*, 2017 WL 1018596, at *5. We look at all the admitted evidence in the light most favorable to the finding, indulging every

10

reasonable inference in favor of the finding, and assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *See id.* In a heightened factual-sufficiency review, we must give due consideration to evidence that the fact-finder could reasonably have found to be clear and convincing. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). Evidence is factually sufficient if the fact-finder could reasonably form a firm belief or conviction about the truth of the allegations in the applications. *K.E.W. v. State*, 333 S.W.3d 850, 855 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *In re M.M.*, 184 S.W.3d 416, 418 (Tex. App.—Dallas 2006, no pet.).

In both a legal- and factual-sufficiency review, the fact-finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *In re S.P.*, 444 S.W.3d 299, 302–03 (Tex. App.—Fort Worth 2014, no pet.). Clear and convincing is not unequivocal or undisputed evidence; it is that measure or degree of proof that will lead to a firm belief or conviction as to the truth of the allegations. *Id.* at 302.

### B. ORDER FOR TEMPORARY MENTAL-HEALTH SERVICES

Clear and convincing evidence to support an order for temporary mental-health services must include (1) expert testimony and (2) evidence of a recent overt act or a continuing pattern of behavior that tends to confirm the likelihood of serious harm to the proposed patient or others, or the proposed patient's distress and the deterioration of the proposed patient's ability to function. *See* Tex. Health & Safety

11

Code Ann. § 574.034(d).  A.D. asserts that the evidence was legally and factually insufficient to show a recent overt act or a continuing pattern of harmful behavior. A.D. contends that her testimony directly contradicted Fadow's testimony about her delusions and that there is no evidence of an overt act showing a likelihood of serious harm.

Even though A.D. contradicted Fadow's opinion regarding A.D.'s need for temporary mental-health services, Fadow described A.D.'s specific behavior forming the basis of his opinion and discussed a recent overt act or a continuing pattern of behavior confirming the likelihood of serious self-harm.  *See J.M. v. State*, 178 S.W.3d 185, 193 (Tex. App.—Houston [1st Dist.] 2005, no pet.) ("[A]n expert opinion recommending involuntary commitment must be supported by the factual bases on which it is grounded and not simply recite the statutory criteria.").  The trial court as the fact-finder was entitled to credit Fadow's testimony over A.D.'s and to weigh the evidence in light of those credibility choices.  Viewed in this light, the evidence authorized the trial court to reasonably form a firm belief or conviction about the truth of the allegations in the State's application for temporary mental-health services. *See, e.g.*, *M.M.*, 184 S.W.3d at 418–19; *State ex rel. M.D.*, No. 12-05-00425-CV, 2006 WL 1791661, at *4–5 (Tex. App.—Tyler June 30, 2006, no pet.) (mem. op.); *State ex rel. K.H.*, No. 2-02-301-CV, 2003 WL 21404821, at *3–4 (Tex. App.—Fort Worth June 19, 2003, no pet.) (mem. op.).  We overrule issue one.

12

## C. Administration of Psychoactive Medications

In her second issue, A.D. argues that the order authorizing psychoactive medications was erroneous because it was not based on a valid order for temporary mental-health services. *See* Tex. Health & Safety Code Ann. § 574.106(a)(1). This issue, as argued by A.D., is predicated on a conclusion that the order for temporary mental-health services was supported by insufficient evidence. *Cf. In re State ex rel. K.D.C.*, 78 S.W.3d 543, 551–52 (Tex. App.—Amarillo 2002, no pet.) ("[H]aving sustained K.D.C.'s [sufficiency challenges to the order for temporary mental-health services], we also . . . reverse the trial court's order authorizing administration of psychoactive medication."). It was not, as we have discussed. Accordingly, we overrule issue two.

## III. CONCLUSION

Although A.D. disagreed with Fadow that she required temporary mental-health services and explained why she refused to eat or take medications, the trial court could have reasonably relied on Fadow's contrary testimony that A.D. would continue to deteriorate and harm herself based on her continuing delusions and paranoia about food and about her health. We will not second-guess those determinations. The evidence was legally and factually sufficient to support the trial court's order for temporary mental-health services. Because this order was supported by sufficient evidence, the psychoactive-medication order is not ipso facto invalid as argued by A.D. We overrule A.D.'s issues and affirm the trial court's October 2, 2019

13

"Judgment Granting Temporary Inpatient Mental Health Commitment" and "Order to Authorize Psychoactive Medication." *See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

Lee Gabriel
Justice

Delivered:  January 7, 2019